## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CITIZENS FOR RESPONSIBILITY AND** | ) | |
| **ETHICS IN WASHINGTON** | ) | |
| 455 Massachusetts Ave., N.W. Sixth Floor | ) | |
| Washington, D.C. 20001, | ) | |
| | ) | |
| **MELANIE SLOAN** | ) | |
| 660 Pennsylvania Ave., S.E., Suite 303 | ) | |
| Washington, D.C. 20003 | ) | |
| | ) | Civil Action No. |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **FEDERAL ELECTION COMISSION** | ) | |
| 999 E Street, N.W. | ) | |
| Washington, D.C. 20463, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1.      This is an action for injunctive and declaratory relief under the Federal Election

Campaign Act of 1971 ("FECA"), 52 U.S.C. § 30109(a)(8)(C), and the Administrative

Procedure Act, 5 U.S.C. § 706, challenging as arbitrary, capricious, an abuse of discretion, and

contrary to law the dismissal by the Federal Election Commission ("FEC" or "Commission") of

an administrative complaint by Citizens for Responsibility and Ethics in Washington ("CREW")

and Melanie Sloan against the Commission on Hope, Growth and Opportunity ("CHGO") for

failing to comply with the disclosure and disclaimer requirements that the FECA imposes on

groups spending on independent expenditures and electioneering communications, and the

organization, registration, and reporting requirements the FECA imposes on "political

committees."

1

2.     As alleged below, the FEC's Office of General Counsel ("OGC") found that CHGO spent approximately $4.05 million—about 85% of its spending over its entire life—on federal campaign activities, including more than $2.9 million on independent expenditures and more than $1.1 million on electioneering communications in the 2010 federal elections, without reporting a single expense to the FEC.  When the OGC investigated CHGO for violating the FECA, CHGO agents provided false or misleading testimony to the OGC, failed to retain or destroyed relevant documents, and tried to close up shop—while pocketing the $1.1 million CHGO did not spend—all to thwart the FEC investigation by running out the clock on enforcement.

3.     Three FEC commissioners were apparently content to let CHGO do so. Employing statutory interpretations contrary to law, they refused to enforce the FECA against CHGO, rather voting to dismiss Plaintiffs' administrative complaint on the grounds that (a) the statute of limitations had run as a result of CHGO's stall tactics, and (b) in the interim, CHGO had been shuttered to evade enforcement.

4.     The law cannot and does not protect such scofflaws.  Allowing CHGO to go without reprimand will merely create a roadmap for other groups to evade the reach of the FECA and the FEC:  (1) take millions of dollars in contributions, (2) spend millions of dollars to run campaign ads, (3) file no reports with the FEC, (4) then close up shop and abscond with whatever leftover money remains at the first sign of investigation.  Plaintiffs respectfully request that this Court tear up that roadmap.  Plaintiffs respectfully ask this Court to declare that the three controlling commissioners' dismissal of Plaintiffs' complaint and refusal to enforce the law is arbitrary, capricious, an abuse of discretion, and contrary to law, and to order the FEC to enforce the law against CHGO.

## JURISDICTION AND VENUE

5.      This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 52 U.S.C. § 30109(a)(8)(A) and 5 U.S.C. § 702.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331, and 28 U.S.C. §§ 2201(a) and 2202.  Venue lies in this district under 52 U.S.C. § 30109(a)(8)(A) and 28 U.S.C. § 1391(e).

## PARTIES

6.      Plaintiff CREW is a non-profit, non-partisan corporation organized under section 501(c)(3) of the Internal Revenue Code.

7.      CREW is committed to protecting the rights of citizens to be informed about the activities of government officials, ensuring the integrity of government officials, protecting our political system against corruption, and reducing the influence of money in politics.  CREW works to advance reforms in the areas of campaign finance, lobbying, ethics, and transparency. Further, CREW seeks to ensure campaign finance laws are properly interpreted, enforced, and implemented.

8.      To advance its mission, CREW uses a combination of research, litigation, advocacy, and public education to disseminate information to the public about public officials and their actions, and the outside influences that have been brought to bear on those actions.  A core part of this work is examining and exposing the special interests that have influenced our elections and elected officials and using that information to educate voters regarding the integrity of public officials, candidates for public office, the electoral process and our system of government.

9.      Toward this end, CREW monitors the activities of those who run for federal office as well as those groups financially supporting candidates for office or advocating for or against their election. CREW regularly reviews campaign finance reports that groups, candidates, and political parties file with the FEC disclosing their expenditures and, in some cases, their contributors. Using the information in those reports CREW, through its website, press releases, reports, and other methods of distribution, publicizes the role of these individuals and entities in the electoral process and the extent to which they have violated federal campaign finance laws.

10.     CREW also files complaints with the FEC when it discovers violations of the FECA. Publicizing violations of the FECA and filing complaints with the FEC serve CREW's mission of keeping the public, and voters in particular, informed about individuals and entities that violate campaign finance laws and deterring future violations of campaign finance laws.

11.     CREW is hindered in carrying out its core programmatic activities when those individuals and entities that attempt to influence elections and elected officials are able to keep their identities hidden. Likewise, the FEC's refusal to properly administer the campaign finance laws, particularly the FECA's reporting requirements, hinders CREW in its programmatic activity, as compliance with those reporting requirements often provides CREW with the only source of information about those individuals and groups funding the political process. As a result of the FEC's refusal to enforce the FECA's disclosure provisions, organizations like CHGO have been able to pour vast amounts of "dark" or anonymous money into the political system without revealing the source of that money. This deprives CREW of information critical to advancing its ongoing mission of educating the public to ensure the public continues to have a vital voice in our political process and government decisions.

12.    A part of CREW's work in carrying out its central mission focuses on so-called "pay-to-play" schemes.  Toward that end, CREW looks for correlations between donations to the campaign of a member of Congress or candidate and that member's subsequent congressional activities, including pushing issues and legislation that serve the interests of the member's donors.  Information that an individual or entity made a large dollar contribution may be very revealing about the influences that donor has brought to bear on the member post-election. Without information about the individuals and entities funding the political activities of organizations like CHGO, CREW is stymied in fulfilling its central mission.

13.    As an example, in May 2013, CREW issued a report, *Rise of the Machines*, detailing the growing political influence of high frequency traders in Washington.  CREW's analysis was based in large part on the lobbying and campaign contribution records of 48 companies specializing in high frequency trading.  That data revealed that between the 2008 and 2012 election cycles, the campaign contributions of these firms increased by 673 percent, from $2.1 million during the 2008 election cycle to $16.1 million during the 2012 cycle.  CREW was able to obtain this information because of the disclosure requirements to which the organizations receiving those contributions—federal candidates, party committees, PACs, and super PACs—are subject under the FECA.

14.    As another example, CREW published *Stealth Donors*, a December 2012 report on donors who gave more than $1,000,000 to super PACs trying to influence the 2012 election.  The report revealed a dozen donors with policy or business interests that depended on the outcome of the elections, but whose efforts to sway voters largely were out of the public view.  CREW obtained the information used in this report from information the FECA requires political committees to disclose.

15.     For an organization like CHGO that refuses to report campaign expenditures and refuses to identify itself as a political committee and comply with the FECA's disclosure requirements, CREW has no access to information detailing its campaign activities and the sources of the money it is using for such activities. As a result, CREW is harmed when the FEC fails to properly administer the FECA, particularly the statute's reporting requirements, thereby limiting CREW's ability to obtain and review campaign finance information.

16.     At the time CREW filed its administrative complaint against CHGO, plaintiff Melanie Sloan was the executive director of CREW. She is a citizen of the United States and a registered voter and resident of the District of Columbia. As a registered voter, Ms. Sloan is entitled to receive all the information the FECA requires political committees to report publicly and to the FEC's proper administration of the provisions of the FECA. Ms. Sloan is harmed in exercising her right to an informed vote when a person fails to disclose his or her spending on independent expenditures and electioneering communications and when a political committee fails to disclose the source of its funds used for political activities, as the FECA requires.

17.     Ms. Sloan also is personally committed to ensuring the integrity of federal elections. Toward that end, Ms. Sloan reviews campaign finance filings and media reports to determine whether candidates and political committees are complying with the FECA's requirements.

18.     When CREW and Ms. Sloan file complaints against violators of the FECA, they rely on the FEC, as the exclusive civil enforcement authority, to comply strictly with the FECA when making its enforcement decisions. *See* 52 U.S.C. § 30107(e). CREW and Ms. Sloan are harmed and are "aggrieved" parties when the FEC dismisses their complaints contrary to the

FECA, refuses to enforce the FECA's mandatory disclosure requirements, or otherwise acts contrary to the requirements of the FECA. *See* 52 U.S.C. § 30109(a)(8)(C).

19.     Defendant FEC is the federal agency established by Congress to oversee the administration and civil enforcement of the FECA. *See* 52 U.S.C. §§ 30106, 30106(b)(1).

## STATUTORY AND REGULATORY FRAMEWORK

20.     The FECA and the implementing FEC regulations impose a number of disclosure and other requirements on groups engaging in campaign related spending.

### *Independent Expenditures*

21.     The FECA and the FEC implementing regulations define an "independent expenditure" as "an expenditure by a person . . . expressly advocating the election or defeat of a clearly identified candidate . . . that is not made in concert or cooperation with or at the request or suggestion of such candidate . . . ." 52 U.S.C. § 30101(17); 11 C.F.R § 100.16.[1]

22.     A person must file a report with the FEC disclosing spending on independent expenditures if the person spends more than $250 in a calendar year on independent expenditures.  52 U.S.C. § 30104(c)(1); 11 C.F.R. § 109.10.

23.     The report must disclose the recipient of the independent expenditure; the date, amount, and purpose of any such independent expenditure; whether such independent

---

[1] FEC regulations define "expressly advocating" as "any communication that—(a) Uses phrases such as 'vote for the President,' 're-elect your Congressman,' 'support the Democratic nominee,' [etc.] . . . or individual word(s), which in context can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidate(s) . . . or (b) When taken as a whole and with limited reference to external events, such as proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one more clearly identified candidate(s) because—(1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and (2) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action."  11 C.F.R. § 100.22.

expenditure is in support of, or in opposition to, a candidate; the name and office sought by such candidate; and a certification that the expenditure was made without coordination with the candidate.  52 U.S.C. § 30104(c)(2)(A) (incorporating reporting requirements of 52 U.S.C. § 30104(b)(6)(B)(iii)); 11 C.F.R. § 109.10(e).  The report must also identify each "person (other than a political committee) who makes a contribution to the reporting committee during the reporting period, whose contributions have an aggregate amount or value in excess of $200 within the calendar year . . . , together with the date and amount of any such contribution."  52 U.S.C. § 30104(c)(1) (incorporating reporting requirements of 52 U.S.C. § 30104(b)(3)(A)). Further, the report must disclose "the identification of each person who made a contribution in excess of $200 to the person filing such statement which was made for the purpose of furthering an independent expenditure."  52 U.S.C. § 30104(c)(2)(C); *cf.* 11 C.F.R. § 109.10(e)(vi) (requiring disclosure of each person who made a contribution in excess of $200 made for the purpose of "furthering the reported independent expenditure").

### *Electioneering Communications*

24.    The FECA and FEC regulations define an "electioneering communication" as "any broadcast, cable, or satellite communication" which "refers to a clearly identified candidate for Federal office," is publicly distributed within "60 days before a general, special, or runoff election for the office sought by the candidate, or . . . 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate, and . . . is targeted to the relevant electorate."  52 U.S.C. § 30104(f)(3)(A); 11 C.F.R. § 100.29(a).

25.    A person must file a report with the FEC disclosing expenditures on electioneering communications if the person spends more than $10,000 on electioneering communications in a calendar year. *See* 52 U.S.C. § 30104(f)(1); 11 C.F.R. § 104.20(b).

26.    The report must disclose the identity of the person making the disbursement for the electioneering communication, the amount of each disbursement of more than $200 during the covered period and the identity of the person receiving such disbursement, the election to which the electioneering communication pertains and the name of the candidate or candidates identified. *See* 52 U.S.C. § 30104(f)(2); 11 C.F.R. § 104.20(c)(1)–(6).  Further, a report by an unincorporated associations like CHGO must disclose "the name and address of each donor who donated am amount aggregating $1,000 or more to the person making the disbursement, aggregating since the first day of the preceding calendar year." 11 C.F.R. § 104.20(c)(8), Electioneering Communications, 72 Fed. Reg. 72899, 72911 (Dec. 26, 2007).

### *Disclaimers*

27.    An independent expenditure or electioneering communication in the form of a communication transmitted through television must include a disclaimer.  52 U.S.C. § 30120(d)(2); 11 C.F.R. § 110.11(c)(4).  The communication must include the audio statement that "[the person paying for the communication] is responsible for the content of this advertising," conveyed by a representative of the person paying for the communication either in an unobscured, full-screen view of the representative or in a voiceover.  52 U.S.C. § 30120(d)(2); 11 C.F.R. § 110.11(c)(4)(i)–(ii).  The communication must also include this statement in a "clearly readable manner."  52 U.S.C. § 30120(d)(2); 11 C.F.R. § 110.11(c)(4)(iii).

*Political Committees*

28.     The FECA and implementing FEC regulations define a "political committee" as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 52 U.S.C. § 30101(4)(A); 11 C.F.R. § 100.5(a).

29.     The FECA defines an "expenditure" as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(9)(A). The Supreme Court has clarified that an "expenditure" for the purpose of this definition includes only "funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *See Buckley v. Valeo*, 424 U.S. 1, 80 (1976).

30.     In *Buckley*, the Court applied an additional requirement for an organization to be classified as a political committee: that the organization's "major purpose" be the nomination or election of federal candidates. *See* 424 U.S. at 79.

31.     The FEC conducts a fact-intensive, case-by-case analysis of an organization to determine if its major purpose is the nomination or election of federal candidates. Federal Election Commission, Political Committee Status, Supplemental Explanation and Justification, 72 Fed. Reg. 5595, 5601 (Feb. 7, 2007) ("Supplemental E&J"). An organization can meet the major purpose test through sufficiently extensive spending on federal campaign activity. *See FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 262 (1986); Supplemental E&J.

32.     Through the Supplemental E&J the FEC provided additional guidance on the factors it uses to determine an organization's major purpose. These include, inter alia, public and non-public statements about the organization's purposes and activities; public and non-public

fundraising appeals; and the proportion of spending related to "federal campaign activity" compared to the proportion spent on "activities that [a]re not campaign related."

33.     The FECA and FEC regulations require all political committees to register with the FEC within 10 days of becoming a political committee. 52 U.S.C. § 30103(a); 11 C.F.R. § 102(d).

34.     Further, under the FECA and implementing FEC regulations, political committees must file periodic reports with the FEC that, among other things: (1) identify all individuals contributing an aggregate of more than $200 in a year to the organization, and the amount each individual contributed; (2) identify all political committees making a contribution to the organization, and the amount each committee contributed; (3) detail all of the organization's outstanding debts and obligations; and (4) list all of the organization's expenditures, including its independent expenditures and electioneering communications. 52 U.S.C. § 30104(a)(4), (b), (f)(1); 11 C.F.R. §§ 104.3, 104.4, 104.20(b).

### *Enforcement*

35.     Under the FECA, any person who believes there has been a violation of the FECA may file a sworn complaint with the FEC. 52 U.S.C. § 30109(a)(1). Based on the complaint, the response from the person alleged to have violated the Act, and any recommendation of the OGC, the FEC may then vote on whether there is "reason to believe" a violation of the FECA has occurred. 52 U.S.C. § 30109(a)(2). If the FEC finds there is "reason to believe" a violation of the FECA has occurred, the FEC must notify the respondents of that finding and must "make an investigation of such alleged violation." *Id.*

36.     After the investigation, the OGC may recommend the FEC vote on whether there is "probable cause" to believe the FECA has been violated. 52 U.S.C. § 30109(a)(3). The OGC

must notify the respondents of any such recommendation and provide them with a brief stating the position of the OGC on the legal and factual issues presented, to which the respondents may reply. *Id.*

37.     Upon consideration of these briefs, the FEC may then determine whether there is "probable cause" to believe a violation of the FECA has occurred.  52 U.S.C. § 30109(a)(4)(A)(i).  If the FEC finds probable cause to believe a violation of the FECA has occurred, the FEC must attempt for at least 30 days, but not more than 90 days, to resolve the matter "by informal methods of conference, conciliation and persuasion," *id.*, a process that does not involve the complainant.

38.     If the FEC is unable to settle the matter through informal methods, it may institute a civil action for legal and equitable relief in the appropriate United States district court.  52 U.S.C. § 30109(a)(6)(A).  In any action instituted by the FEC, a district court may grant injunctive relief as well as impose monetary penalties.  52 U.S.C. § 30109(a)(6)(B)–(C).

39.     If at any stage of the proceedings the FEC dismisses a complaint, any "party aggrieved" may seek judicial review of that dismissal in the United States District Court for the District of Columbia.  52 U.S.C. § 30109(a)(8)(A).  All petitions from the dismissal of a complaint by the FEC must be filed "within 60 days after the date of the dismissal."  52 U.S.C. § 30109(a)(8)(B).

40.     The district court reviewing the FEC's dismissal of a complaint may declare the FEC's actions "contrary to law."  52 U.S.C. § 30109(a)(8)(C).  The court also may order the FEC "to conform with such declaration within 30 days."  *Id.*  If the FEC fails to abide by the court's order, the FECA provides the complainant with a private right of action, brought in the complainants' own name, "to remedy the violation involved in the original complaint."  *Id.*

## FACTUAL BACKGROUND

41.    CHGO formed in March 2010 as a Washington, D.C. based unincorporated nonprofit association.  The IRS recognized CHGO as an exempt organization under section 501(c)(4) of the Internal Revenue Code.  CHGO has not registered as a political committee with the FEC.

### *CHGO's Federal Campaign Activity*

42.    According to the OGC's findings, between September 25 and November 3, 2010, CHGO spent more than $4.05 million on independent expenditures and electioneering communications.  The vast majority of that money was spent producing and broadcasting television advertisements in 15 elections for seats in the U.S. House of Representatives.

43.    In at least 12 of these elections, CHGO broadcast advertisements attacking one candidate and supporting a competitor.

44.    CHGO spent at least $438,310[2] to broadcast two advertisements attacking Rep. John Spratt (D-SC) and supporting his Republican opponent, Mick Mulvaney.

45.    Specifically, CHGO spent at least $239,480 to broadcast one advertisement titled "Song and Dance" between September 25 and October 3, 2010.  In this advertisement CHGO stated that even though "it's the worst economy in decades," Spratt, "instead of looking out for us, approved billions in deficit spending without missing a beat."  CHGO then encouraged voters to "pull the plug on this song and dance once and for all," and to "join Mick Mulvaney's fight

---

[2] Reported sums are based on estimates obtained by CREW from the Campaign Media Analysis Group ("CMAG"), a group which tracks political advertisements broadcast on local, national, and cable television.  The data collected by CMAG includes the date of the advertising, the market in which it was broadcast, the content of the advertising, and the estimated cost of the air time purchased.  The OGC obtained additional (and likely more accurate) information about the amounts CHGO spent on each advertisement.  That data, however, was not included in the public record released by the FEC.

against the big spenders in Washington." On screen at the end of the advertisement appeared the words "Fight back. Join Mick Mulvaney. Stop the big spenders in Congress." The OGC concluded that this advertisement constituted an independent expenditure.

46.      CHGO spent at least $198,830 to broadcast the second advertisement, titled "Collectible Coin," between October 28 and November 2, 2010. This advertisement ostensibly advertised a collectible coin commemorating President Obama "increasing our national debt to a staggering $13.4 trillion" and Spratt's votes for the agenda of House Speaker Nancy Pelosi (D-CA). CHGO then told voters to call Spratt "to order yours today," and said "Mick Mulvaney has a better idea—stop the spending and get America working again." On screen at the end of this advertisement appeared the words "Help Mick Mulvaney. Stop the Spending. Make America Work Again." The OGC found this advertisement constituted an independent expenditure.

47.      CHGO spent at least $240,690 to broadcast the "Song and Dance" advertisement against Rep. Kathy Dahlkemper (D-PA) and in support of her opponent, Republican Mike Kelly, between September 29 and October 5, 2010. The OGC concluded that this advertisement constituted an independent expenditure.

48.      CHGO spent at least $238,740 to broadcast the "Song and Dance" advertisement against Rep. Frank Kratovil (D-MD) and in support of Republican Andy Harris between September 29 and October 15, 2010. The OGC concluded that this advertisement constituted an independent expenditure.

49.      CHGO spent at least $74,240 to broadcast the "Song and Dance" advertisement against Rep. Allen Boyd (D-FL) and in support of Republican Steve Southerland between September 29 and October 5, 2010. The OGC concluded that this advertisement constituted an independent expenditure.

50.    CHGO spent at least $131,830 to broadcast the "Collectible Coin" advertisement against Rep. Suzanne Kosmas (D-FL) and in support of Republican Sandy Adams between October 8 and 14, 2010.  The OGC concluded that this advertisement constituted an independent expenditure.

51.    CHGO spent at least $101,070 to broadcast the "Collectible Coin" advertisement against Rep. Baron Hill (D-IN) and in support of Republican Todd Young between October 29 and November 1, 2010.  The OGC concluded that this advertisement constituted an independent expenditure.

52.    CHGO spent at least $76,230 to broadcast the "Collectible Coin" advertisement against Rep. C.A. (Dutch) Ruppersberger (D-MD) and in support of Republican Marcelo Cardarelli between October 15 and November 1, 2010.  The OGC concluded that this advertisement constituted an independent expenditure.

53.    CHGO spent at least $53,580 to broadcast the "Collectible Coin" advertisement against Rep. Paul Kanjorski (D-PA) and in support of Republican Lou Barletta between October 1 and 7, 2010.  The OGC concluded that this advertisement constituted an independent expenditure.

54.    CHGO also spent at least $263,650 to broadcast an advertisement titled "Make America Work" against Rep. John Salazar (D-CO) and in support of his Republican opponent, Scott Tipton, between October 1 and October 9, 2010.  In this advertisement, CHGO first identified Salazar as a candidate, then stated Salazar "squandered billions on a bogus stimulus bill as unemployment skyrocketed," and "led the charge with Pelosi for Obamacare, further crippling rural Colorado's economy."  CHGO then touted Tipton, saying "he believes Coloradans know best how to create jobs and grow our economy," and encouraging voters to

"help Scott Tipton make America work again." The OGC concluded that this advertisement constituted an independent expenditure.

55.     CHGO spent at least $99,160 to broadcast a similar "Make America Work" advertisement against Rep. Dan Maffei (D-NY) and in support of Republican Ann Marie Buerkle between October 25 and November 3, 2010. CHGO also spent at least $65,860 to broadcast the "Collectible Coin" advertisement against Maffei and in support of Buerkle between October 21 and 25, 2010. The OGC concluded that both of these advertisements constituted independent expenditures.

56.     According to the OGC's findings, CHGO also spent unknown amounts on two additional versions of the "Collectible Coin" advertisement that were broadcast in the 2010 elections. In one advertisement, CHGO apparently attacked Rep. Carolyn McCarthy (D-NY) and endorsed her competitor, Republican Francis S. Becker, Jr. In another, CHGO apparently attacked Rep. Barney Frank (D-MA) and endorsed his opponent, Republican Sean Bielat. The OGC concluded that both of these advertisements constituted independent expenditures.

57.     CHGO broadcast four additional advertisements in four races that aired close to the election that attacked or praised a single candidate.

58.     CHGO spent at least $74,370 to broadcast the "Collectible Coin" advertisement in support of Rep. Walt Minnick (D-ID) between October 13 and 19, 2010 that did not mention his opponent. The OGC concluded that this advertisement constituted an electioneering communication.

59.     CHGO spent at least $415,270 to broadcast an advertisement against Rep. Carol Shea-Porter (D-NH) between October 8 and 16, 2010. In this advertisement, CHGO noted Shea-Porter's votes for the stimulus package and the health care bill, and added "it gets worse"

because Shea-Porter "voted for the Pelosi House agenda 93%" of the time.  CHGO then

encouraged voters to call Shea-Porter and "let her know if what you believe is what she believes"

while the words "does she believe what we believe?" appeared on the screen.  The OGC

concluded that this advertisement constituted an electioneering communication.

60.   CHGO spent at least $41,100 to broadcast a second advertisement against Rep.

Boyd (D-FL) between October 27 and November 1, 2010.  In this advertisement, CHGO asserted

Rep. Boyd was one of Pelosi's most loyal followers, but after he "voted no on Obamacare,

Queen Nancy shouted 'off with his head,' and Allen quickly changed his vote to yes."  CHGO

then encouraged voters to call Rep. Boyd and urge him "to vote no again" and "repeal

Obamacare."  The OGC concluded that this advertisement constituted an electioneering

communication.

61.   According to the OGC's findings, CHGO also spent an unknown sum to run an

advertisement in the 2010 election featuring a candidate from Arizona's 7th congressional

district.  The OGC concluded that this advertisement constituted an electioneering

communication.

62.   On the screen at the end of each advertisement appeared a written disclaimer:

"Paid for by the Commission on Hope, Growth and Opportunity, a tax-exempt 501(c)(4)

organization and not a federal political committee.  This message is not coordinated with any

candidate or committee."  CHGO's website, www.hopegrowthopportunity.org, appeared at the

bottom of the screen.

### *FEC Investigation of CHGO*

63.   On October 4, 2010, after some of these advertisements had aired, the Democratic

Congressional Campaign Committee ("DCCC") filed a complaint with the FEC alleging CHGO

failed to file any independent expenditure or electioneering communications reports for advertisements it broadcast as of October 1, 2010.

64.    On October 15, 2010, the FEC sent a letter to CHGO's attorney, William B. Canfield III, instructing CHGO to preserve documents related to the complaint, as required by law.

65.    On May 23, 2011, plaintiffs CREW and Melanie Sloan filed a complaint with the FEC against CHGO for violations of the FECA ("MUR 6471").  The complaint alleged that CHGO failed to report independent expenditures and electioneering communications to the FEC in violation of 52 U.S.C. § 30104(g) and 11 C.F.R. § 109.10(c)–(d), and/or 52 U.S.C. § 30104(f)(1) and 11 C.F.R. § 104.20(b).  Plaintiffs alleged that CHGO's violation of the FECA's reporting requirements were knowing and willful and thus subject to criminal penalties and referral to the Department of Justice pursuant to 52 U.S.C. § 30109(a)(5)(C), (d)(1). Plaintiffs further alleged CHGO's advertisements failed to include the proper disclaimers, in violation of 52 U.S.C. § 30120(d)(2) and 11 C.F.R. § 110.11(c)(4).

66.    On June 1, 2011, CHGO answered the DCCC's complaint.  On October 20, 2011, CHGO answered Plaintiffs' complaint.

67.    CHGO filed its 2010 Form 990 tax return with the Internal Revenue Service on or about November 14, 2011.  CHGO reported to the IRS it spent a total of $4,770,000 on all expenditures in 2010, including reported payments to a company called Meridian Strategies, LLC ("Meridian") of $4,319,825 for "media placement," $275,000 for "media production," and $105,175 for "advertising and technology" in 2010.  CHGO also reported that it spent no money on political activities on behalf of or in opposition to candidates for public office in 2010 and reported no fundraising expenses.  The 990 listed no directors and only two officers for CHGO:

Mr. Canfield and James S. "Steven" Powell, CHGO's President.  Schedule B of the 990 listed the amounts of six contributions, including one for $4 million, but did not disclose the identity of the contributors.

68.    On April 16, 2012, Michael H. Mihalke, a principal with Meridian, CHGO's media-buyer, emailed CHGO's treasurer, James Warring, and CHGO's attorney, William Canfield, suggesting that CHGO be terminated "most quickly" because "[t]here is an outstanding matter at the Federal Elections [*sic*] Commission and my sense is that we ought to shut it down to make things less complicated moving forward."

69.    On April 26, 2012, plaintiffs filed an amended complaint with the FEC against CHGO.  The amended complaint reiterated plaintiffs' allegations that CHGO failed to file required independent expenditure and electioneering communication reports and that CHGO failed to include legally required disclaimers.  The amended complaint further alleged that, as demonstrated by its extensive spending on federal campaign activities, CHGO's major purpose in 2010 was the nomination or election of federal candidates and, as a result, CHGO violated the FECA, 52 U.S.C. §§ 30103(a), 30104, and implementing FEC regulations, 11 C.F.R. §§ 102.1(d), 104.1(a), by failing to register and report as a political committee.

70.    On May 4, 2012, CHGO filed its 2011 Form 990 with the IRS.  CHGO's 2011 990 indicated that CHGO had terminated in 2011.  The 2011 990, like the earlier 2010 990, reported that CHGO engaged in no political campaign activities and incurred no fundraising expenses. The only expenses reported on the 2011 Form 990 were $15,000 for management, $2,922 for legal, and approximately $14,000 in other expenses.   And again, no directors were listed and only two officers were identified:  Mr. Canfield and Mr. Powell.

71.    On December 27, 2013, the OGC issued its First General Counsel's Report ("First Report"). The First Report recommended finding reason to believe that CHGO had violated the FECA's independent expenditure and electioneering reporting requirements; disclaimer requirements; and organization, registration, and reporting requirements for political committees. In the First Report, the OGC concluded that each of the advertisements included in plaintiffs' complaint constituted either an independent expenditure or electioneering communication, requiring CHGO to report such communications to the FEC in accordance with FECA. Applying the definition of express advocacy found in 11 C.F.R. § 100.22 and articulated by the Supreme Court, the OGC further found that, in 2010, CHGO spent at least $1.7 million on independent expenditures and $530,000 on electioneering communications, and that a substantial portion of CHGO's remaining media-related expenditures of approximately $2.3 million may have related to either independent expenditures or electioneering communications. The OGC noted that a group need not spend more than 50% of its budget on federal campaign activities for its major purpose to be the nomination or election or a candidate, but it was possible that a majority of CHGO expenditures were for federal campaign activity. Consequently, the OGC recommended finding reason to believe that CHGO's major purpose was the nomination or election of federal candidates and, thus, that CHGO violated the FECA by failing to organize, register, and report as a political committee. Finally, the OGC recommended the use of compulsory process to ascertain the scope of CHGO's reporting obligations.

72.    On September 16, 2014, the Commission voted on the OGC's recommendations in the First Report. By a vote of 6-0, the Commission found reason to believe CHGO violated 52 U.S.C. § 30104 by failing to report its independent expenditures and electioneering communications. The Commission authorized the use of compulsory process to assist in the

OGC's investigation of that matter, authorized the Factual and Legal Analysis underlying its decision, and authorized a letter to CHGO to notify it of the FEC's findings. The Commission deadlocked, however, on the OGC's recommendations to find reason to believe that CHGO failed to include proper disclaimers, and failed to organize, register, and report as a political committee. The Commission voted 6-0 to take "[t]ake no action at this time" as to these recommendations.

73. On September 30, 2014, the FEC notified CHGO of its findings and informed CHGO of their factual and legal basis. The notification stated that plaintiffs' amended complaint "raises the additional question of whether CHGO satisfies the definition of 'political committee,'" but that the FEC "takes no action on these issues at this time."

74. On July 28, 2015, the OGC issued a Second General Counsel's Report ("Second Report"). The Second Report reiterated the First Report's recommendation to find reason to believe that CHGO violated the FECA's reporting requirements for independent expenditures and electioneering communications. The Second Report further recommended that the Commission find reason to believe that CHGO failed to organize, register, and report as a political committee, citing additional evidence uncovered in its investigation bolstering OGC's conclusion that CHGO's major purpose was the nomination or election of a candidate.

75. In particular, the Second Report indicated that the OGC spoke with CHGO's general counsel, William Canfield. Mr. Canfield stated that OGC's 2010 990 accurately reflected CHGO's spending activities. He further stated that, despite the FEC's repeated notices to Mr. Canfield instructing him to preserve CHGO's documents, he possessed no records concerning the advertisements and that he did not know who would. In a subsequent response

to an FEC order to answer questions, Mr. Canfield further represented that his role at CHGO was limited to legal compliance.

76.     The Second Report further stated that, in November 2014, the OGC interviewed Steven Powell, the reported President of CHGO, who was represented by Mr. Canfield during the interview.  Mr. Powell stated that, despite being listed as CHGO's president, his role was limited to writing and producing advertisements.  He identified Michael Mihalke, a principal at Meridian, as responsible for billing and invoicing advertisements.  And despite the FEC notice to preserve documents sent to CHGO while it was still airing ads, Mr. Powell stated that he believed any relevant documents would have been destroyed after the ads aired.  Nonetheless, Mr. Powell and Mr. Canfield stated that the advertisements identified in plaintiffs' amended complaint were the only advertisements disseminated by CHGO and that they represented all of CHGO's media spending.

77.     The OGC next interviewed James Warring, Treasurer of CHGO and founder of Warring & Company, LLC, the firm responsible for CHGO's accounting and tax filings. According to CHGO's articles of association, the treasurer was responsible for keeping all "minute books, correspondence, and other records" of CHGO.  Mr. Warring confirmed CHGO paid Meridian $4.7 million in August, September, and October 2010.

78.     None of the individuals the OGC interviewed could or did produce any documentation itemizing CHGO's spending on advertisements, even in response to FEC orders to produce documents.  Nonetheless, the subpoena responses identified Scott Reed, a strategist who the responses stated was involved in the formation of CHGO, as an individual who may have documents.  Mr. Reed asserted, however, that he could not recall being involved in the formation of CHGO and that he had no such documents, even though he admitted—after first

22

denying substantial involvement with CHGO—that he was involved in discussions on the strategic placement of television advertisements for CHGO.

79.     Nonetheless, based on the information gathered, the OGC concluded that CHGO's major purpose was the nomination or election of a federal candidate.  Witnesses testified that $4.59 million spent by CHGO on media were for the advertisements identified in the complaints, representing approximately 96% of CHGO's expenditures in 2010.  The OGC could not, however, itemize CHGO's spending on each advertisement and thus could not definitively determine the sums spent on independent expenditures versus electioneering communications. Nonetheless, the OGC inferred from the available evidence that a majority of CHGO's media expenses went to independent expenditures.  Noting that $1.7 million of the $2.2 million spent by CHGO, as reported by CMAG, went towards independent expenditures, the OGC concluded that "it is probable that CHGO spent the same general proportion of its total spending on express-advocacy advertisements."  Accordingly, CHGO concluded that at least 77% of CHGO's advertisements, or 74% of its total spending, went towards independent expenditures.

80.     The OGC also noted that several internal documents produced by witnesses further supported the conclusion that CHGO's major purpose was the nomination or election of a federal candidate.  In particular, a planning document stated that CHGO's goal was "[t]o make an impact using express advocacy in targeted Senate races on key issues including financial reform, energy, tax, pharmaceuticals, health care and other key concerns"; it also identified twelve states as "potential targets."  A PowerPoint presentation similarly identified CHGO's goal as "mak[ing] a measurable impact on the election outcome in selectively identified Senate races by deploying advertising in a targeted, cost efficient and discreet manner."  The OGC recognized the CHGO's focus had apparently turned since these documents were produced from Senate

races to House races, but indicated that the documents nonetheless demonstrated that CHGO's purpose was to nominate or elect at least some federal candidate. Further, a September 15, 2010 letter from Wayne Berman, who Mr. Mihalke identified as a CHGO "consultant," to a potential donor described CHGO as "an organization which focuses on running independent expenditure campaigns in key districts to support the election of Republican candidates," and further assured the donor that contributions to CHGO would not be disclosed. The OGC finally noted that none of the documents received during the investigation of CHGO reflected a purpose to educate the public on matters of economic policy formulation, despite CHGO representing itself to the FEC and IRS as having only such a purpose.

81.    The Second Report further recommended finding reason to believe the CHGO failed to include legally required disclaimers with its advertisements.

82.    Finally, the Second Report included a recommendation that has been redacted from the public record.

83.    Despite the overwhelming evidence of CHGO's major purpose, Vice Chairman Matthew S. Petersen and Commissioners Caroline C. Hunter and Lee E. Goodman proposed entering into a conciliation agreement as to the reporting violations only, refusing to agree to the OGC's recommendation to find reason to believe CHGO violated the FECA's political committee and disclaimer requirements. The Commission did not take a formal vote, however, and the OGC continued its investigation.

84.    On September 24, 2015, the OGC issued its Third General Counsel's Report ("Third Report"). The Third Report again found reason to believe CHGO violated the FECA's reporting requirements for independent expenditures and electioneering communications. The Third Report also found reason to believe CHGO violated FECA's disclaimer requirements.

And the Third Report again found reason to believe CHGO failed to organize, register, and report as a political committee, citing yet more evidence identifying that CHGO's major purpose was the nomination or election of federal candidates.

85.     According to the Third Report, the OGC contacted 144 television stations in broadcast areas utilized by CHGO to obtain records regarding CHGO's spending on the advertisements at issue.  In the process, the OGC uncovered documents demonstrating that CHGO and Meridian used a subvendor, New Day Media Services, LLC ("New Day"), for ad placement.  The OGC discovered that Meridian made no payments for advertisement placement itself.

86.     Based on New Day's bank records, the OGC determined that Meridian transferred $3.2 million to New Day to pay for advertisement placements.  The OGC was also able to itemize payments, based on the records, for each advertisement and determine whether the expenditures went to independent expenditure advertisements or electioneering communications.

87.     In addition, the OGC obtained records in November 2014 showing that CHGO used an additional subvendor, Verve Broadcast Design ("Verve").  An employee at Verve informed the OGC that Meridian paid Verve to produce and edit the CHGO-related ads at issue. The OGC further learned that Mr. Powell supervised the media production work performed by Verve.

88.     Verve also produced to the OGC invoices relating to three additional advertisements that were not mentioned in the complaints.  These advertisements had not been identified by any of the OGC's prior witnesses.

89.     The OGC conducted a follow-up interview with Mr. Powell, who confirmed that he had worked with Verve and that, despite previously representing that all of CHGO's

advertisements were referenced in the complaints, CHGO had developed and paid for the three additional advertisements identified by Verve. Mr. Powell also stated for the first time that he received approximately $100,000 from Meridian for his ad production work, separate from his compensation as President of CHGO.

90.     The OGC also contacted Wayne Berman, the individual Mr. Mihalke had identified as a consultant for CHGO. Counsel for Mr. Berman stipulated that Mr. Berman "only offered informal and infrequent fundraising advice strictly on a volunteer basis," that Mr. Berman did not engage in consulting work with CHGO, and that Mr. Berman had no role in creating, producing, or distributing advertisements on behalf of CHGO.

91.     The OGC also interviewed Mr. Mihalke, the principal at Meridian. Mr. Mihalke stated that Meridian acted as the exclusive vendor for CHGO and that Meridian had hired a number of subvendors. Mr. Mihalke stated that New Day was the only vendor hired by Meridian to handle advertisement placement for CHGO-related advertisements and that Meridian made no direct ad placements itself for CHGO. He further stated that he received a commission of approximately $300,000 for his CHGO-related work.

92.     Describing his work, Mr. Mihalke stated that the "CHGO board" provided him with targets for strategic ads, and then Meridian would develop plans for ad buys and provided these to "the board." Mr. Mihalke did not identify the members of this board, but he stated that Mr. Canfield and Mr. Reed approved the content, production, and placement of all CHGO-related television ads, contradicting the previous statements of Mr. Canfield and Mr. Reed about their respective roles.[3]

_____

[3] An additional sub vendor interviewed by the OGC, Kira Swencki, further contradicted Mr. Reed's representation as to his limited role, stating that she would provide him with PowerPoint presentations and that he would provide edits and instructions.

93.    In the interview with Mr. Mihalke, the OGC noted a $1.1 million discrepancy in the funds received by Meridian for media placement and the funds paid to New Day for media placement.  According to the Third Report,

> Mihalke represented that, as ad placement proceeded, Meridian apprised CHGO of the amounts spent on ads.  He said that, at the time, he told Reed of the unused CHGO funds.  Mihalke said Reed told him that the remaining funds would be evenly divided among Reed, Mihalke, and Wayne Berman to cover costs of fundraising, and that this would be deemed a "fundraising commission." Mihalke explained that his portion of these remaining funds was intended to cover his costs of serving as the exclusive vendor for CHGO.

Mr. Mihalke confirmed that his one-third allocation was not related to the approximately $300,000 he was paid for his advertisement-related services.  Mr. Mihalke stated that his conversation with Mr. Reed occurred after the 2010 election and that the actual distribution occurred "sometime the following year."

94.    In contrast to Mr. Reed's apparent assertion that shares of the $1.1 million would be "deemed a fundraising commission," CHGO's Form 990 for year 2010, submitted to the IRS on November 14, 2011, listed "0" fundraising expenses.  It similarly listed no expenditures for "[p]rofessional fundraising services."  Moreover, the Form 990's description of Meridian's services did not include fundraising; nor did the Form list any other fundraising service from an independent contractor.  CHGO's Form 990 for 2011, submitted to the IRS on May 4, 2012, similarly listed "0" in fundraising expense, no "[p]rofessional fundraising services," and no independent contractor expenses for fundraising.  Additionally, Mr. Berman stipulated to a "volunteer" and "informal" fundraising role, not a paid role.  Mr. Reed omitted any reference to fundraising services in his testimony; nor did he or any public document from CHGO provide any indication that he had authority to dictate where CHGO's unused funds could go.

95.     Based on these various interviews and documents, the OGC once again concluded that CHGO met the requirements to qualify as a political committee.  The OGC calculated that CHGO, through Meridian, spent $4.05 million on the advertisements.  The OGC was further able to itemize CHGO's media expenditures and found that CHGO spent approximately $2.9 million on independent expenditures and $1.1 million on electioneering communications.  The OGC concluded CHGO easily met the statutory expenditure requirement to qualify as a political committee and that, based on the fact that "a significant majority" of CHGO's spending related to the ads at issue, it similarly met the "major purpose" test.  Indeed, it found that 85% of CHGO's spending in 2010 was related to federal campaign activity.

96.     In addition, the OGC alternatively calculated CHGO's activities based solely on its expenditures on independent expenditure communications.  Looking solely to CHGO's spending on independent expenditures in 2010, the OGC concluded that such spending constituted 61% of CHGO's spending during its entire organization lifetime.

97.     The OGC further calculated alternative proportions with and without counting the amounts of CHGO's unused funds allegedly distributed to Mr. Reed, Mr. Berman, and Mr. Mihlake.  The Third Report stated that, if the unused $1.1 million were excluded both from the independent expenditure calculation and from CHGO's total expenditures, then 76% of CHGO's expenditures over its entire lifetime constituted independent expenditures.  Further, even if the distributed unused $1.1 million were excluded from CHGO's independent expenditures but were still included in CHGO's total expenditures—a calculation which the OGC thought would ignore Mr. Mihalke's role as CHGO's media vendor and Reed's role in approving CHGO advertisement placement—CHGO's independent expenditures would still constitute 56% of CHGO's total expenditures over its lifetime.

98.     Accordingly, the Third Report stated, "[r]egardless of how CHGO's major purpose is evaluated, one thing is clear—a definite majority of CHGO's spending was on activities that reflect the major purpose of influencing federal elections."

99.     The Third Report further noted that, as found in the Second Report, internal documents from CHGO also evidenced that CHGO's major purpose was the nomination or election of a candidate.

100.     Consequently, the Third Report recommended finding reason to believe CHGO violated the FECA by failing to organize, register, and report as a political committee.

101.     As in the Second Report, a fourth recommendation was redacted from the publicly released version of the report.

### *FEC Dismissal of the Complaint*

102.     Nevertheless, despite OGC's in-depth investigation, its repeated recommendations to find reason to believe that CHGO violated the FECA, the overwhelming evidence provided in the complaints and uncovered by OGC, and even the 6-0 vote of the Commissioners previously finding reason to believe that CHGO at least violated the FECA's reporting requirements, on October 1, 2015, the Commission deadlocked 3-3 on all of the OGC's recommendations in the Third Report.  Unable to proceed, the Commission voted to dismiss the complaints by a vote of 5 to 1.

103.     On November 5, 2015, the three commissioners voting against the OGC's recommendations—Vice Chairman Petersen, and Commissioners Hunter and Goodman—issued a Statement of Reasons explaining their vote not to find "reason to believe" any violation of FECA occurred.  According to the three controlling commissioners, CHGO's stated purpose was

"to educate the public on matters of economic policy formulation," and that it "apparently furthered these efforts primarily by broadcasting communications across the country."

104.    The three commissioners admitted that, after the OGC issued its First Report, "the available information was sufficient to support a finding of reason to believe that CHGO had failed to report its communications as required by the Act." Nonetheless, the three commissioners thought "the information available at the time did not support a finding of reason to believe that CHGO had failed to organize, register, and report as a political committee." First, the three commissioners "did not agree" with the OGC's analysis of CHGO's communications to determine which communications constituted express advocacy, "and, therefore, the conclusion that $1.7 million of the spending alleged in the complaint qualified as expenditures." Second, the three commissioners took issue with the OGC's extrapolation in the First Report of the breakdown of the $2.2 million reportedly spent by CHGO's on CHGO's other media expenses. Nevertheless, the three commissioners admitted that they "signed on to a Factual and Legal Analysis that placed [CHGO] on notice that the Commission was considering whether CHGO's activities qualified it as a political committee." Further, according to the three Commissioners, they anticipated that, based on additional information gathered by the OGC, the Commission would be able to make a finding regarding CHGO's political committee status.

105.    With regard to the Second Report, the three commissioners stated that it "had not developed any more information detailing CHGO's spending on specific communications." The three commissioners did not discuss, however, the OGC's discovery of CHGO's internal documents admitting that CHGO's major purpose was the nomination or election of federal candidates and did not state why such documents were insufficient to show CHGO was a political committee.

106.     With regard to the Third Report, the three commissioners still concluded that the information provided by the OGC "did not definitively resolve whether there was reason to believe CHGO was a political committee and raised novel legal issues that the Commission had no briefing or time to decide." Nor did they indicate just what about CHGO's millions in campaign ads led them to believe that CHGO's major purpose could be anything other than to nominate or elect candidates.

107.     Nonetheless, according to the three commissioners, "[w]hat did crystallize was that the case had become an academic exercise" because "[t]he obvious violations became time barred in October." They further found that CHGO "no longer existed, having filed termination papers with the IRS in 2011," "had no money," "[t]here were no people acting on its behalf," and "there did not appear to be any agents of CHGO with whom the Commission could conciliate or who could otherwise legally bind the defunct organization." Accordingly, they "concluded that any conciliation effort would be futile, and the most prudent course was to close the file consistent with the Commission's exercise of its discretion in similar matters."

108.     Two of the remaining commissioners—Chairman Ann M. Ravel and Commissioner Ellen L. Weintraub—issued their own Statement of Reasons on November 5, 2015. The two commissioners noted that they had voted to approve OGC's recommendation to find reason to believe that CHGO was a political committee more than a year ago, when the OGC issued its First Report. The Second Report "only reinforced [their] previous determination that CHGO was undoubtedly a political committee" by uncovering CHGO's internal documents admitting CHGO's major purpose. Further, according to the two commissioners, "[m]any of CHGO's ads contained language that can only be reasonably interpreted as a call to vote for or against a particular candidate."

109.     The two commissioners further stated:

> Three of our colleagues have gone to great lengths to avoid
> enforcing the law against dark money groups like CHGO. As we've
> mentioned in prior statements, they have made a series of unfounded
> arguments for why groups like CHGO don't meet the "major
> purpose" test. Our colleagues will not count any advertisements
> towards major purpose unless that advertisement expressly
> advocates for a candidate—even advertisements that attack a
> candidate's record and praise the opponent's, in the candidate's
> jurisdiction, right before the election. Unless the advertisement has
> "magic words" (*e.g.*, "vote for Smith"), our colleagues will
> generally not consider it to be express advocacy, regardless of the
> content. And even if an organization does run the "Vote for Smith"
> ads, they will not find the organization to have met the major
> purpose test unless over 50% of the organization's total spending
> was for those ads—even if the bulk of the organization's other
> spending is on office space, salaries, and administrative costs solely
> to enable staff members to work on ads.
>
> In other words, under our colleagues' analysis, it's entirely possible
> for a group to devote *all* of its resources to supporting or opposing
> federal candidates, but still not be a political committee, as long as
> they keep up some minimal façade asserting that they are an issue-
> oriented group

110.     The two commissioners further noted that "[i]t apparently bears little significance

[to the three controlling commissioners] that CHGO leaders decided to close up shop 'most

quickly' because of the pending Commission matter, leaving our lawyers and investigators to

piece together records from television stations and previously undisclosed subvendors to

determine CHGO's media spending."

## THE FEC'S STATUTE OF LIMITATIONS
## DOES NOT BAR RELIEF, HAS NOT BEGUN TO RUN, OR IS TOLLED

111.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as fully

set forth herein. The statute of limitations for the FEC to pursue a civil penalty for a violation of

the FECA is five years.  *See* 28 U.S.C. § 2462. Notwithstanding the statute of limitations, the

FEC may pursue a claim for injunctive or equitable relief more than five years after the violation

giving rise to the claim. *See, e.g., FEC v. Christian Coalition*, 965 F. Supp. 66, 71 (D.D.C. 1997). The FEC has authority to pursue injunctive, equitable, and declaratory relief for violations of the FECA, *see* 52 U.S.C. § 30109(a)(6). Accordingly, the FEC may still seek such relief against CHGO irrespective of the statute of limitations. Further, section 2462 is subject to equitable tolling. *See United States SEC v. Brown*, 740 F. Supp. 2d 148, 158 (D.D.C. 2010). Here, section 2462 was tolled during the FEC's investigation due to CHGO's and its agents' fraudulent concealment of operative facts by failing to file legally required disclosures with the FEC, by failing to retain or destroying records relating to CHGO's media spending despite a legal duty to preserve such documents, by making knowingly false or misleading statements to the OGC, by filing false Form 990s with the IRS, and by terminating CHGO despite FEC's ongoing investigation. Accordingly, the statute of limitations did not begin to run until, at the earliest, the OGC discovered this concealment and, accordingly, the FEC may seek other appropriate relief. Finally, section 2462 is tolled where a defendant's violation is continuing. *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 919 F. Supp. 1, 6 (D.D.C. 1994). CHGO continues to violate the FECA by failing to disclose legally required information related to its independent expenditures and electioneering communications, and the information that political committees are required to disclose. Accordingly, the FEC may still seek to remedy these continuing violations.

## PLAINTIFF'S CLAIMS FOR RELIEF

### CLAIM ONE
### The FEC's Dismissal of MUR 6471 is
### Arbitrary, Capricious, an Abuse of Discretion, and Contrary to Law

116.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as fully set forth herein.

117.    The FEC's dismissal of the complaint was arbitrary, capricious, an abuse of discretion, and contrary to law in violation of 52 U.S.C. § 30109(a)(8)(C) and 5 U.S.C. § 706 because, in part, it rested on impermissible interpretations of the FECA, ignored prior FEC and judicial precedent, and mischaracterized political campaign activities.

118.    The OGC concluded that CHGO spent approximately $4.05 million on federal campaign activity, including more than $2.9 million on independent expenditures and more than $1.1 million on electioneering communications, all without filing a single independent expenditure or electioneering communication report, or filing and reporting with the FEC as a political committee.

119.    The controlling commissioners provided no explanation why they found no reason to believe CHGO violated the FECA's reporting requirements for independent expenditures and electioneering communications—despite finding such reason to believe one year earlier—and their disagreement with the OGC's categorization of CHGO's spending is unsupported by authority and contrary to law.

120.    The controlling commissioners similarly provided no explanation as to why they found no reason to believe CHGO violated the FECA's disclaimer provisions.

121.    The controlling commissioners' apparent application of the major purpose test to exclude as irrelevant CHGO's spending on all non-express-advocacy campaign activity is contrary to law.  Moreover, assuming *arguendo* that the controlling commissioners' sole focus on CHGO's express advocacy spending was appropriate, their failure to find reason to believe CHGO was a political committee remains arbitrary, capricious, an abuse of discretion, and contrary to law.  CHGO spent more than 50% of its budget over its life on express advocacy, and CHGO's internal documents demonstrated that CHGO was organized for the purpose of

nominating or electing federal candidates, yet the controlling commissioners provided no explanation as to why these facts were insufficient to find reason to believe CHGO was a political committee.

122.    The FEC's dismissal of the complaint was also arbitrary, capricious, an abuse of discretion, and contrary to law in violation of 52 U.S.C. § 30109(a)(8)(C) and 5 U.S.C. § 706 because, in further part, it was based on an impermissible interpretation of 28 U.S.C. § 2462. The FEC still may pursue a claim for injunctive or equitable relief, section 2462 is subject to equitable tolling, and section 2462 is tolled where a defendant's violation is continuing.

123.    The FEC's dismissal of the complaint was also arbitrary, capricious, an abuse of discretion, and contrary to law in violation of 52 U.S.C. § 30109(a)(8)(C) and 5 U.S.C. § 706 because, in further part, it erroneously concluded that no individual or group could be held responsible for CHGO's violations.  The controlling commissioners provided no explanation for this judgment, and their conclusions are erroneous.

124.    The FECA holds treasurers personally liable for a political committee's violations of the FECA.  CHGO's treasurer, Mr. Warring, was responsible for maintaining CHGO's records and filing appropriate reports with the FEC, but failed to do so.  Mr. Warring remains subject to possible FEC enforcement, including an order that Mr. Warring correct CHGO's reporting failures by filing and making public appropriate disclosure statements.

125.    Similarly, other CHGO officials and individuals remain subject to possible FEC enforcement for violations for which they are personally responsible or for which they were legally responsible.

126.     Further, as a political committee, CHGO could not terminate until it filed an appropriate statement with the FEC, a statement CHGO did not file.  Accordingly, under the FECA, CHGO did not terminate and remains subject to FEC enforcement.

127.     Finally, the FEC may recoup, through CHGO, the $1.1 million transferred to Mr. Mihalke, Mr. Reed, and Mr. Berman, as the monies were fraudulently conveyed from CHGO with the intent to hinder enforcement of any possible FEC judgment.  28 U.S.C. § 3304(b)(1)(A).  Alternatively, the $1.1 million may be recouped as a constructive fraud because CHGO did not receive any reasonably equivalent value from Mr. Mihalke, Mr. Reed, or Mr. Berman in return.  28 U.S.C. § 3304(b)(1)(B).  Mr. Mihalke already received $300,000 for his media-related services, and he provided no fundraising services.  Mr. Reed's role was purportedly "limited," and included no reported fundraising services to CHGO.  Mr. Berman stipulated that his role was "voluntary" and "informal":  not warranting a six-figure commission.   Accordingly, the FEC may recover all or some of this $1.1 million as penalty for CHGO's violations. 28 U.S.C. § 3306(a).

128.     The controlling commissioners failed to explain why such avenues of enforcement were unavailable, and, to the extent they considered such options and found them unavailable, their conclusions were contrary to law.

129.     Plaintiffs are therefore entitled to relief in the form of a declaratory order that defendant FEC is in violation of its statutory responsibilities under 52 U.S.C. § 30109(a)(8) and 5 U.S.C. § 706 and has acted arbitrary or capriciously, abused its discretion, or acted contrary to law in dismissing MUR 6471.

## <u>REQUESTED RELIEF</u>

WHEREFORE, plaintiffs respectfully request that this Court:

(1)    Declare that the FEC's dismissal of MUR 6471 was arbitrary, capricious, an abuse of discretion, and contrary to law;

(2)    Order the FEC to conform to such declaration within 30 days pursuant to 52 U.S.C. § 30109(a)(8)(C);

(3)    Award plaintiffs their costs, expenses, and reasonable attorneys' fees in this action; and

(4)    Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

ADAM J. RAPPAPORT
(D.C. Bar No. 479866)
Citizens for Responsibility and Ethics
          in Washington
455 Massachusetts Ave. N.W., Sixth Floor
Washington, D.C. 20001
Phone: (202) 408-5565
Facsimile: (202) 588-5020
arappaport@citizensforethics.org

November 23, 2015                                    *Attorney for Plaintiffs*