**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND | : | |
| ETHICS IN WASHINGTON, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Civil Action No.:    15-2038 (RC) |
| v. | : | |
| | : | Re Document Nos.:   19, 20 |
| FEDERAL ELECTION COMMISSION, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

The parties agree that the Federal Election Commission had strong grounds to prosecute

the Commission on Hope, Growth and Opportunity under the Federal Election Campaign Act,

but declined to do so.  The parties' main source of disagreement is the extent to which the FEC

can decline to prosecute after receiving a citizen complaint.  Citizens for Responsibility and

Ethics in Washington contends that the FEC relied on improper legal grounds when it dismissed

its complaint against the Commission on Hope, Growth and Opportunity.  The FEC responds by

noting that its dismissal was not primarily based on legal interpretations, but rather the agency's

discretion in deciding which cases it wishes to pursue.  Specifically, the commissioners who

voted to dismiss Plaintiffs' complaint note that, by the time the FEC could have moved forward

with prosecuting the case, the statute of limitations on the "obvious" violations had run, the other

violations were not clear-cut from a legal perspective, and the group had dissolved and had no

identifiable agents or assets.  Because any further prosecution would have cost the FEC more

than any benefit it calculated that it could derive, the FEC argues that its dismissal was within the scope of its prosecutorial discretion.  Concluding that the FEC rationally dismissed Plaintiffs' complaint as an exercise of its prosecutorial discretion, the Court will grant summary judgment for Defendant.

## II.  STATUTORY AND REGULATORY BACKGROUND

### A.  The Federal Election Commission

The Federal Election Commission ("FEC") is a six-member, independent agency charged with administering the Federal Election Campaign Act ("FECA").  52 U.S.C. § 30106(a)–(b). The FEC has the power to "administer, seek to obtain compliance with, and formulate policy with respect to" FECA, and has exclusive jurisdiction to civilly enforce FECA.  *Id.* § 30106(b)(1).  The votes of four commissioners are required for the FEC to pursue enforcement proceedings, civil actions, or even voluntary compliance with FECA.  *See id.* §§ 30106(c), 30107(a)(6)–(9).  Third parties who believe that a violation of FECA has occurred may file a "citizen complaint" with the FEC.  *Id.* § 30109(a)(1).  After the FEC receives a citizen complaint and any response from the alleged violator, if it determines by a vote that it has "reason to believe" that a violation has occurred, FECA states that the FEC "shall . . . notify the person of the alleged violation . . . [and] shall make an investigation of such alleged violation."  *See id.* § 30109(a)(2).  At that point, the FEC's Office of General Counsel ("OGC") is charged with preparing a brief outlining OGC's position on the law and facts of the case.  *Id.* § 30109(a)(3). OGC's brief, along with a reply brief from the respondent, are then considered by the FEC in a vote on whether probable cause exists to believe that a violation has occurred.  *Id.*  If the FEC determines that probable cause exists, it must attempt to informally and privately resolve the dispute.  *See id.* §§ 30109(a)(4)(A)(i)–(B)(i).  If those attempts fail, the FEC may, by vote,

determine whether to institute a civil action.  *Id.* § 30109(a)(6)(A).  A third party who is

"aggrieved" by an FEC decision to dismiss a complaint may seek judicial review of the FEC

decision.  *Id.* § 30109(a)(8)(A).  The statute of limitations for FECA actions is five years.  *See* 28

U.S.C. § 2462.

### B.  The Federal Election Campaign Act

FECA was enacted to limit spending in federal campaigns and eliminate the perceived or

actual influence that wealthy individuals can have over elections based on their capacity to

bankroll campaigns.  *See Orloski v. FEC*, 795 F.2d 156, 163 (D.C. Cir. 1986).  Accordingly,

FECA imposes several limitations on campaign contributions and expenditures, often based on

the source of the contributions and expenditures.  *See generally* 52 U.S.C. §§ 30101–30126.

Several of those limitations are relevant here.

### 1.  Political Committees

FECA requires noncandidate "political committees" to register with the FEC, keep

records of the names and addresses of contributors, and periodically file reports identifying their

contributors, among other requirements.  *See* 52 U.S.C. §§ 30102–30105.  Thus, whether a group

is legally classified as a political committee has significant practical consequences.  Under

FECA, a political committee is "any committee, club, association, or other group of persons

which receives contributions aggregating in excess of $1,000 during a calendar year or which

makes expenditures aggregating in excess of $1,000 during a calendar year."  *Id.* § 30101(4)(a).

Although this definition appears broad at first glance, it is limited by FECA's definitions of

"contributions" and "expenditures," which require an intent to "influenc[e] any election for

Federal office."  *See id.* §§ 30101(8)(A), 30101(9)(A).  Out of concern for overbreadth of this

definition, which could be construed to reach "groups engaged purely in issue discussion," the

Supreme Court has limited this definition further, effectively restricting FECA's rules governing

political committees to "organizations that are under the control of a candidate or the major

purpose of which is the nomination or election of a candidate." *Buckley v. Valeo*, 424 U.S. 1, 79

(1976). The FEC determines a group's "major purpose" on a case-by-case basis, taking into

account the group's allocation of spending, public and private statements, and overall conduct.

*See* 72 Fed. Reg. 5595, 5601 (Feb. 7, 2007); *Shays v. FEC*, 511 F. Supp. 2d 19, 23, 30 (D.D.C.

2007).

### 2. Expenditure-Related Reporting Requirements

In addition to regulating political committees, FECA requires anyone who makes

"independent expenditures" of more than $250 over the course of a calendar year to publicly

disclose certain information by filing with the FEC. *See* 52 U.S.C. § 30104(c)(1). Among the

information provided, the person making the independent expenditure must disclose the identity

"of each person who made a contribution in excess of $200 to the person filing such report [if

the] contribution was made for the purpose of furthering the reported independent expenditure."

*See* 11 C.F.R. § 109.10(e)(vi). Like the definition of "political committee," whether an

expenditure is an "independent expenditure" has significant implications. An "independent

expenditure" is an expenditure made by a person "expressly advocating the election or defeat of

a clearly identified candidate" that is not made in coordination with a candidate, party, or

political committee. *See* 52 U.S.C. § 30101(17). "Clearly identified" means that the name or

photograph of the candidate appears, or "the identity of the candidate is apparent by

unambiguous reference." *Id.* § 30101(18). "Express advocacy" includes phrases like "vote for

the President," "re-elect your Congressman," "support the Democratic nominee," and "Smith for

Congress." *See* 11 C.F.R. § 100.22(a).

FECA also requires those engaged in certain "electioneering communications" to disclose the identities of major contributors. *See* 52 U.S.C. § 30104(f). An electioneering communication is a mass broadcast targeting a relevant electorate that refers to a clearly identified candidate for federal office and is made within 60 days of a general election or 30 days of a primary election. *See* 11 C.F.R. § 100.29(a). Such communications must include disclaimers with information like the person who paid for the communication and whether it is authorized by the candidate. *See id.* § 110.11.

### III. FACTUAL BACKGROUND

Citizens for Responsibility and Ethics in Washington and its former executive director Melanie Sloan (collectively "CREW") take issue with the FEC's handling of a case involving the Commission for Hope, Growth and Opportunity ("CHGO"). Thus, this case involves both the substantive matter that was before the FEC and the FEC's handing of it. There are few factual disputes. The Court first outlines the formation and operation of CHGO, then moves to the FEC's investigation before detailing the FEC's ultimate decision to dismiss the case against CHGO.

### A. CHGO

According to Michael Mihalke, the president of Meridian Strategies, LLC, Scott Reed, a political consultant, approached him about forming CHGO in early 2010. *See* Joint Appendix ("J.A.") 327, 332, ECF No. 25. Mr. Mihalke apparently recruited James Powell to be CEO and William Canfield to be CHGO's legal counsel. *See* J.A. 363–64. Although Mr. Powell was CEO in form, is his view he was only the "creative" person, responsible for the content of the advertisements that CHGO developed. *See* J.A. 365.

Mr. Canfield, in comparison, was quite active in the formation of CHGO.  After helping to form CHGO, Mr. Canfield applied for its § 501(c)(4) tax exempt status from the IRS, and in doing so certified, under penalty of perjury, that CHGO was a "public welfare organization created to advance the principle that sustained and expanding economic growth is central to America's economic future."  *See* J.A. 1548–49.  Mr. Canfield further stated that the group would "engage economists and other business experts to inform its understanding of the necessity for sustained economic growth and [would] bring the fruits of this expertise and research directly to the attention of decision makers at all levels of government."  J.A. 1549. And, in responding to the question "[D]oes [CHGO] plan to spend any money attempting to influence the selection, nomination, election, or appointment of any person to any . . . public office or to an office in a political organization?," Mr. Canfield checked the box for "No."  J.A. 1551.  The IRS granted CHGO § 501(c)(4) tax-exempt status—which is reserved for nonprofit groups operated "exclusively for the promotion of social welfare," *see* 26 U.S.C. § 501(c)(4)— based on Mr. Canfield's application.  *See* J.A. 114–15; 1549.  Having 501(c)(4) status was important to CHGO because it meant that it would not have to disclose its donors, *see* 26 U.S.C. 6104(d)(3)(A).  In a slideshow, CHGO stated that 501(c)(4) status was the "most advantageous vehicle for donor activity" because "donor names [are] never made available to the public under law."  J.A. 336.  If CHGO stated that it did plan to influence elections, it would have needed to seek tax-exempt status under § 527, which would have required it to disclose the names of its donors.  *See* 26 U.S.C. § 527(j)(2)–(3).

Despite CHGO's representations to the IRS, the record reveals significant evidence that CHGO actually was created and operated for the purpose of influencing several federal elections. *See* Pls.' Mem. P. & A. Supp. Pls.' Mot. Summ. J. ("Pls.' Mot. Summ. J.") at 7–9, ECF No. 19;

Def.'s Mem. Supp. Mot. Summ. J. & Opp'n Pl's Mot. Summ. J. ("Def.'s Mot. Summ. J.") at 18–

26, ECF No. 20.  In the slideshow mentioned above, CHGO asserted that *Citizens United*

"create[d] [an] [u]nprecendented [o]pportunity [a]llow[ing] corporations, labor unions[,] and

individuals to engage in direct, express advocacy for [the] election or defeat of candidate(s)."

*See* J.A. 335.  CHGO further stated that it had a "[s]imple mission with all decisions guided by

[the] best use of funds to win Senate seats."  J.A. 337.   To win Senate seats, CHGO stated that it

would use "all options available to it for direct, express advocacy under [*Citizens United*]," and

aimed its resources at specific states.  J.A. 332–33.[1]

In furtherance of its "simple mission," CHGO ran television advertisements in at least

fifteen markets.  *See* J.A. 1496–1500.  One such advertisement, entitled "Song and Dance,"

featured specific 2010 candidates for federal office in a variety of congressional districts.  *See*

J.A. 213.  An iteration of the commercial featured Democratic incumbent Representative Allen

Boyd and his Republican challenger Steve Southerland.  A voiceover in the ad states:

> It's the worst economy in decades.  And the folks in Washington are living it up, spending our tax dollars like there's no tomorrow.  Leading this big song and dance: Obama, of course, and Nancy Pelosi.  But there's one face you might not expect to see—our old friend Allen Boyd.  Instead of looking out for us, Boyd approved billions in deficit spending without missing a beat.  Let's pull the plug on this song and dance once and for all.

J.A. 213.  Then, the screen fades to black, an image of Steve Southerland appears, then the

following text appears on the screen: "Fight back.  Join Steve Southerland.  Stop the Big

Spenders in Congress."  J.A. 213.  While that text is on the screen, the voiceover says "Join

Steve Southerland's fight against the big spenders in Washington."  J.A. 213–14.  CHGO ran a

similar ad entitled "Collectible Coin," a tongue-in-cheek commemoration of national debt levels,

---

[1] At some point, unexplained in the record, CHGO apparently turned its attention from Senate seats to those in the House of Representatives.

once again advocating for the election or defeat of specific candidates for federal office.  J.A.

209–11.  The messages contained the following disclaimers: "Paid for by the Commission on

Hope, Growth, and Opportunity, a tax-exempt 501c4 organization and not a federal political

committee.  This message is not coordinated with any federal candidate or committee."  J.A. 48.

### B.  Complaints and Initial FEC Action

About a month before the 2010 midterm elections, the Democratic Congressional

Campaign Committee ("DCCC") filed an FEC complaint, contending that CHGO's ads

constituted either independent expenditures or electioneering communications and that CHGO

had not complied with the relevant reporting or disclaimer requirements.  *See* J.A. 1–5.  Later

that month, the FEC informed Mr. Canfield of the complaint and the organization's obligation to

preserve relevant documents.  J.A. 9.  In April 2011, the FEC denied CHGO's motion to dismiss.

J.A. 23.  Shortly thereafter, CREW submitted an FEC complaint on grounds similar to the

DCCC's complaint.  J.A. 25–40.  In May, the FEC gave CHGO notice of the action and again

informed it of its obligation to preserve documents.  J.A. 42.  In June, CHGO, through its general

counsel Mr. Canfield, submitted its response to the complaints.  *See* J.A. 45.  Mr. Canfield stated

that CHGO was a tax-exempt social welfare organization under § 501(c)(4) dedicated to public

education on macroeconomic issues.  J.A. 46.  He specifically contended that CHGO "functions

as an economic 'think tank' regarding such federal policy issues as tax, trade, budget[,] and

economic growth."  J.A. 46.  He also stated that none of CHGO's public communications

"support[ed] or oppose[d] any identified federal candidate," and that any specifically-identified

candidate was referenced only with respect to his or her party's position on CHGO's values, and

never "attacked" anyone.  J.A. 46–47.  As for the disclaimer allegation, CHGO argued that its

message sufficed.  In October—about a year after the DCCC filed its complaint—the FEC

informed Mr. Canfield that it was considering whether CHGO had failed to register as a political committee.  J.A. 117.  Mr. Canfield responded with a blanket denial and took exception to the FEC's reliance on newspaper articles during the course of its investigation.  J.A. 118–25.

Then, in November 2011, CHGO filed its 2010 Form 990 with the IRS, reaffirming that it did not "engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office."  J.A. 1561.  However, it did state that it spent $4.6 million in expenses for media placement and production.  J.A. 1566.  It also stated that it incurred no fundraising expenses, and listed Mr. Powell and Mr. Canfield as its only officers.  J.A. 1561, 1565.  CREW later used this Form 990 to calculate that CHGO had used over half of its expenditures on federal campaign ads, supporting its new argument that CHGO failed to register as a political committee.  J.A. 170–71, 176–78.

In January 2012, the FEC informed CHGO that it was still deliberating on the case, and that it expected to vote as to whether it had "reason to believe" that violations occurred by the middle of the year, again reminding CHGO of its obligation to preserve documents.  J.A. 162.  In March, members and non-members of CHGO exchanged emails about dissolving the organization.  J.A. 607.  For a reason that is not directly stated in the record, Mr. Canfield suggested that it was "[r]eally important" for CHGO to dissolve as quickly as possible.  J.A. 609. Mr. Milhalke, forwarding the email from Mr. Canfield, asked what needed to happen for the organization to be "closed most quickly," and stated the following: "There is an outstanding matter at the Federal Elections [sic] Commission and my sense is that we ought to shut it down to make things less complicated moving forward."  J.A. 609.

In May 2012, Mr. Canfield responded to CREW's amended complaint by incorporating his previous responses, and stated that he had no contact with his "inactive client" CHGO since

December 2010, and accordingly had "little knowledge" of the status of CHGO.  J.A. 198.  Mr.

Canfield's emails, however, suggest that he actually did take part in the 2012 dissolution

discussions.  J.A. 609.

### C.  The FEC's Investigation and OGC's Reports

In September 2014, the FEC voted on the allegations submitted by OGC.  J.A. 242.  The

Commission deadlocked with respect to the alleged failure to register as a political committee,

but unanimously found reason to believe that CHGO failed to file required disclosures for its

independent expenditures and electioneering communications, and authorized OGC to use

compulsory process.  J.A. 242–43.

Armed with compulsory process, OGC sought records related to alleged campaign

activities from CHGO.  OGC interviewed Mr. Powell, who was represented by Mr. Canfield.

J.A. 260–61.  Mr. Powell, who was listed as custodian of records in CHGO's tax returns and

previously served as president, J.A. 1564, stated that he was not heavily involved with CHGO

and did not have any records related to its finances or advertisements.  J.A. 260–61.  Mr.

Canfield stated that he did not know where the files were, J.A., 276, but suggested that CHGO's

accountant, James Warring, might still have some records related to the ads.  J.A. 261.  But Mr.

Warring stated that he would have returned any records to CHGO, and commented that his file

on the organization was "sketchy" based on a lack of information.  J.A. 265–66.  Mr. Canfield

acknowledged that Mr. Warring usually shipped records back to Mr. Canfield's office, but

concluded that the records "probably sat for some time," after which the staff in the mailroom

"tossed" the records.  J.A. 276.  Ultimately, Mr. Milhalke produced some documents, including

the slideshow referenced above.  J.A. 328, 330.  He also stated that CHGO had no formal

document retention policies.  J.A. 330.

Overall, the record shows that all the "officers" of CHGO claim to have engaged in compartmentalized work, none of them assuming responsibility for document retention or overall governance.  However, Scott Reed, who Mr. Milhalke called "a consultant," was the person who approached Mr. Milhalke about forming the organization.  *See* J.A. 327.  OGC identified Mr. Reed as the founder of CHGO.  J.A. 80.  Mr. Reed stated that he knew of CHGO and that he had given some advice to it, but could not remember having anything to do with its actual formation. J.A. 653–54.  He did not rule out the possibility that he was involved, stating that he been involved with so many political committees that he did not have a clear recollection.  J.A. 653. The interview took place in July 2015, over five years after CHGO was formed.  J.A. 653.  He stated that he did not have any files related to the organization.  J.A. 654.

Based on its investigation, OGC issued a second report recommending that the FEC find CHGO violated reporting and disclaimer requirements in its ads, and that it proceed to pre-probable cause informal conciliation.  J.A. 926.  OGC further recommended that the FEC find that CHGO was indeed a political committee, and thus violated the FECA's registration and reporting requirements.  J.A. 926.  It based this latter recommendation on its estimation that over 74% of CHGO's spending was for express advocacy, suggesting that its major purpose was the election of federal candidates.  J.A. 936.  OGC's recommendation was bolstered by the CHGO's internal documents strongly suggesting that CHGO was conceived and operated for the purpose of winning federal Congressional elections.  J.A. 937.  By a vote of three to three, the Commission decided not to move forward at this point, preferring instead for OGC to gather more facts on the political committee theory.  J.A. 1518–19.  The three commissioners that would have moved forward were the same that would ultimately dismiss the matter.  J.A. 1518–19.

In September 2015, OGC issued a third report bolstering its factual findings and making the same recommendations as the second report.  J.A. 1467.  The OGC used bank records and the records of media placement companies to calculate that $4.06 million out of $4.77 million total was spent on advertisements, all of which were express-advocacy independent expenditures or electioneering communications.  J.A. 1484.  OGC "thus conclude[d] that 85% of CHGO's spending in 2010 involved federal campaign activity, which demonstrates that CHGO's major purpose was to influence the election of federal candidates."  J.A. 1484. OGC found that 61% of CHGO's spending over its lifetime was on express advocacy alone.  J.A. 1485.  Removing the $1.1 million that, according to Mr. Mihalke, CHGO distributed to Mr. Reed and Mr. Berman to cover fundraising costs, CHGO spent 76% on express advocacy.  J.A. 1485.  Regardless of how ambiguous spending areas are categorized, according to OGC "one thing is clear—a definite majority of CHGO's spending was on activities that reflect the major purpose of influencing federal elections."  J.A. 1486.  According to the three commissioners who would vote against moving forward with the case, it became clear with the final report that CHGO had become a defunct organization without any money, officers, directors, or attorney representing it.  A.R. 1516.

### D.  The FEC's Decision to Dismiss

The FEC deadlocked on all of OGC's recommendations, with three commissioners voting in favor of finding reason to believe that violations had occurred and entering pre-probable cause conciliation, and three voting against.  J.A. 1503.  The three commissioners that would have moved forward with the expenditure-based charges after the second report voted against moving forward after the third.  J.A. 1518.  The statement of reasons of the three commissioners voting against proceeding—Commissioners Petersen, Hunter, and Goodman—

was the Commission's controlling opinion.  J.A. 1516.  Facing deadlock, the Commission voted 5-1 to close the file.  J.A. 1504.

The controlling commissioners' statement of reasons ("SOR") begins by noting that "[t]his matter encountered procedural and evidentiary difficulties from the outset."  J.A. 1516.  The SOR further suggests that OGC's first, nearly year-long investigation "failed to build a sufficiently detailed record of CHGO's activities."  J.A. 1516.  After the first investigation, the SOR continues, the three commissioners "advocated [proceeding on] the obvious disclosure violations—while time still remained under the five-year statute of limitations."  J.A. 1516.  As noted above, the DCCC's administrative complaint was filed in October 2010, it appears from the face of the statute that the statute of limitations was set to expire, at the latest, in October 2015, shortly before the FEC issued its SOR.  *See* J.A. 1, 1520.

The SOR continues by reasoning that while the other commissioners voted to further investigate in pursuit of a broader case for two months,

> it became apparent that CHGO was a defunct organization that had no money, and apparently no officers or directors to bind it in a legal agreement.  Indeed, OGC acknowledged that any further use of the Commission's enforcement process against CHGO would be pyrrhic.[2]  Therefore, with the statute of limitations effectively expired [for the event-driven spending counts], [the controlling commissioners] concluded that this case did not warrant further use of Commission resources.

---

[2] The word "pyrrhic" is instructive of the controlling commissioners' logic.  In saying that further use of the FEC process would be pyrrhic, the controlling commissioners acknowledged that the prosecution may be able to proceed, but that doing so would come at so high a cost as to make any victory comparatively hollow.  The word "pyrrhic" comes from the Greek general Pyrrhus of Epirus, known for his victories that came at disastrously high costs.  *See* Evan Andrews, *5 Famous Pyrrhic Victories*, History, http://www.history.com/news/history-lists/5-famous-pyrrhic-victories (last visited Feb. 22, 2017).  Justice Black referenced the Pyrrhic war in his dissent in *Beauharnais v. Illinois*.  343 U.S. 250, 275 (1952) ("Another such victory and I am undone.").

J.A. 1516.  The controlling opinion did not resolve the political committee issue, instead noting

that it raised novel questions that "the Commission had no briefing or time to decide," and had

become part of the pyrrhic nature of the case.  J.A. 1519.  Without delving too deeply into the

issues surrounding political committees, the controlling commissioners noted that that two such

issues were how to treat "vendor commissions and other general payments to officers or directors

or vendors" and whether the record supported OGC's calculations that 61% of CHGO's

spending "was devoted to communications that expressly advocated the election or defeat of a

federal candidate."  J.A. 1519 n.16.

In the analysis portion of the controlling SOR, the commissioners take issue with the

other commissioners' refusal to proceed on the more obvious violations before the statute of

limitations was set to expire, emphasizing that OGC did not send its investigative report until

less than three months before the statute of limitations was set to expire on the expenditure

violations.  J.A. 1518–19.  The final three paragraphs of the controlling opinion summarized the

ultimate decision for the FEC to exercise its prosecutorial discretion and discontinue prosecution:

> As the statute of limitations dwindled, our colleagues on two occasions delayed action on the matter to afford OGC time to resume its investigation to develop further details on the broader political committee theory.
>
> In the weeks that followed, OGC pursued new investigative leads.  For our part, the information learned during this period did not definitively resolve whether there was reason to believe CHGO was a political committee and raised novel legal issues that the Commission had no briefing or time to decide.  What did crystallize was that the case had become an academic exercise.  The obvious violations became time barred in October.  The organization no longer existed, having filed termination papers with the IRS in 2011.  It had no money.  Its counsel had resigned.  There were no people acting on its behalf, and we learned that there did not appear to be any agents of CHGO with whom the Commission could conciliate or who could otherwise legally bind the defunct organization. . . .
>
> At that point, knowing that CHGO no longer existed and that the statute of limitations effectively foreclosed further enforcement efforts in any event, we concluded that any conciliation effort would be futile, and the most prudent

14

course was to close the file consistent with the Commission's exercise of its
discretion in similar matters.

J.A. 1519.  The final sentence was followed by a footnote citing *Heckler v. Chaney*, and citations

to several cases where the FEC had decided not to pursue proceedings based on grounds such as

the inefficient use of resources, the age of the case, the dissolution of an organization, the fact

that an organization no longer had staff, and the unlikelihood that a party would be able to pay a

penalty.  J.A. 1519.

## IV.  LEGAL STANDARD

The Court reviews FEC decisions to dismiss a complaint under a "contrary to law"

standard.  52 U.S.C. § 30109(a)(8)(c).  Because four votes are required to proceed to

conciliation, in cases of 3-3 deadlocks as is the case here, the Court looks to the reasoning of the

three commissioners voting to dismiss.  *FEC v. Nat'l Republican Senatorial Comm.*, 966 F.2d

1471, 1476 (D.C. Cir. 1992).  In determining whether the dismissal was "contrary to law," the

Court does not interpret the law as it believes best, but asks only whether the FEC's construction

was sufficiently reasonable to be accepted by a reviewing court.  *FEC v. Democratic Senatorial

Campaign Comm.*, 454 U.S. 27, 39 (1981).  "[I]f the meaning of the statute is not clear, a

reviewing court should accord deference to the Commission's rationale."  *Nat'l Republican

Senatorial Comm.*, 966 F.2d at 1476.  The FEC's decision is contrary to law if either (1) "the

FEC dismissed the complaint as a result of an impermissible interpretation of the act" or (2) the

dismissal was arbitrary, capricious, or an abuse of discretion.  *Orloski v. FEC*, 795 F.2d 156, 161

(D.C. Cir. 1986).

In deciding whether to initiate or proceed with charges of alleged FECA violations, the

Court gives broad prosecutorial discretion to the FEC.  *Nader v. FEC*, 823 F. Supp. 2d 53, 65

(D.D.C. 2011); *FEC v. Rose*, 806 F.2d 1081, 1091 (D.C. Cir. 1986) (in the context of a challenge

to the FEC's exercise of prosecutorial discretion, noting that the courts "are not here to run the

agencies").  "An agency decision not to pursue a potential violation involves a complicated

balancing of factors which are appropriately within its expertise, including whether agency

resources are better spent elsewhere, whether its action would result in success, and whether

there are sufficient resources to undertake the action at all." *La Botz v. FEC*, 61 F. Supp. 3d 21,

33–34 (D.D.C. 2014) (citing *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).  Accordingly, in

cases where an agency bases its decision on how to best allocate its resources—which is an area

where the decision is "generally committed to an agency's absolute discretion"—the Court will

not meddle with that decision unless the plaintiff shows that the FEC acted contrary to law by

abusing its discretion.  *See id.* (citing *Heckler*, 470 U.S. at 831); *Rose*, 806 F.2d at 1091 ("In the

absence of evidence of an abuse of discretion, we decline this invitation to second-guess the

[FEC]'s exercise of its discretion. . . . It is not for the judiciary to ride roughshod over agency

procedures or sit as a board of superintend[e]nce directing where limited agency resources will

be devoted.").  This "is 'an extremely deferential standard which requires affirmance if a rational

basis for the agency's decision is shown.'" *La Botz*, 61 F. Supp. 3d at 33 (quoting *Orloski*, 795

F.2d at 167).

When the FEC exercises prosecutorial discretion, its controlling statement of reasons

must be sufficiently detailed so as to allow a reviewing court to determine why the controlling

commissioners decided to forego prosecution.  *See Democratic Cong. Campaign Comm. v. FEC*,

831 F.2d 1131, 1135 (D.C. Cir. 1987).  The controlling commissioners' statement of reasons

must provide the essential facts upon which the decision was based.  *See Lovely v. FEC*, 307 F.

Supp. 2d 294, 298 (D. Mass. 2004).  "Terse" explanations are insufficient; the decision must be

reasoned.  *Robertson v. FEC*, 45 F.3d 486, 493 (D.C. Cir. 1995).  Although the statement of

reasons need not be a model of clarity, neither the parties nor the court may conjure a post hoc

rationale that is not contained in the controlling opinion.  *See id.*; *Lovely*, 307 F. Supp. 2d at 298.

If the decision relies on a departure from previous practice, it must "provide some opinion or

analysis indicating that prior policies are being deliberately changed, not casually ignored."[3]

*Common Cause v. FEC*, 676 F. Supp. 286, 292 (D.D.C. 1986) (citing *Greater Boston T.V. Corp.*

*v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970), *cert. denied*, 403 U.S. 923 (1971)).

## V.  ANALYSIS

CREW takes issue with the FEC's decision to dismiss the case against CHGO in three

respects.  *See* Pls.' Mot. Summ. J. at 33–34.  First, CREW suggests that three different

exceptions to the statute of limitations could have allowed further prosecution.  *See* Pls.' Mot.

Summ. J. at 34.  Second, it argues that the purportedly "novel" legal issues were not novel at all.

See Pls.' Mot. Summ. J. at 43–45.  Finally, CREW argues that the FEC could have pursued

remedies even against a defunct entity.  *See* Pls.' Mot. Summ. J. at 39–43.  Without suggesting

that CREW is completely wrong, the FEC contends that, in light of much uncertainty

surrounding the statute of limitations, political-committee issue, and ability to obtain a

---

[3] CREW argues that the FEC should have articulated a reason for "departing" from past
precedent because of a case where the FEC did seek enforcement "against a defunct group with
few assets."  *See* Pls.' Reply in Supp. Pls.' Mot. Summ. J. & Opp'n to Def.'s Cross-Mot. Summ.
J. ("Pls.' Reply") at 37, ECF No. 22.  CREW's argument fails for two reasons.  First, in that
case, the "few assets" that the defunct organization had were sufficient to cover the civil fine that
the FEC imposed, even though the FEC would have liked to impose a higher fine.  *See In re*
*Taxpayer Network*, MUR 6413 (May 18, 2014), at 3, http://eqs.fec.gov/eqsdocsMUR/
14044353947.pdf.  Second, as CREW points out, "the analysis of whether an agency's actions
were arbitrary and capricious is fact-specific and cannot be satisfied by pointing to the fact that
an agency acted in the same way in another case."  Pls.' Reply at 35.  The exercise of
prosecutorial discretion in a case with similar but distinguishable facts is not a "departure from
past practice."

meaningful remedy, the controlling commissioners rationally concluded that the litigation risk did not justify continued prosecution.  Def.'s Mot. Summ. J. at 33.  CREW responds that the FEC's decision to dismiss was arbitrary and capricious.  *See* Pls.' Reply Supp. Pls.' Mot. Summ. J. & Opp'n Def.'s Cross-Mot. Summ. J. ("Pls.' Reply") at 33, ECF No. 22.

In dismissing the FEC's case against CHGO, the controlling commissioners made a series of choices all of which culminated in a decision to discontinue their prosecution.  The FEC observed that the prosecution of the "obvious" violations was likely barred by the statute of limitations, exceptions notwithstanding.  The remaining political-committee claim raised novel issues that the FEC did not have the time or briefing to decide, and in any case would not provide a surefire victory in court.  And, even if there were not legal issues with prosecution, the defunct nature of the entity—along with the apparent lack of any officer that could conciliate with the FEC—made any remedy, financial or injunctive, extremely difficult.  Taken together, the controlling commissioners concluded that the claim had become an academic exercise plagued with litigation risk and, therefore, not worth pursuing.  Because their conclusion was rational, the Court will not disturb it.  The Court will address the three bases for the FEC's conclusion in turn.

### A.  The Statute of Limitations

The risk that the statute of limitations on the "obvious" expenditure-based violations had run was a major basis for the FEC's dismissal of the case against CHGO.  CREW now argues that the FEC actually could have continued prosecuting CHGO because the statute of limitations does not bar equitable relief, is tolled during continuing violations, and is tolled by fraudulent concealment.  *See* Pls.' Mot. Summ. J. at 34.  The FEC responds that it was unclear whether any of these exceptions applied, and thus the controlling commissioners were rational in exercising

the Commission's prosecutorial discretion.  *See* Def.'s Mot. Summ. J. at 41–47.  The Court determines only whether the FEC's conclusion had a rational basis.

The statute of limitations for FECA actions is five years.  *See* 28 U.S.C. § 2462.  Because the DCCC's administrative complaint was filed in October 2010, the face of the statute of limitations suggested that the expenditure-based claims were time-barred, at the latest, in October 2015, shortly before the FEC issued its SOR.  *See* J.A. 1, 1520.  However, three relevant exceptions may apply to this rule.  First, in cases where there is a significant risk of future harm, the law may allow the FEC to grant equitable relief notwithstanding the expiration of the statute of limitations.  *See FEC v. Christian Coal.*, 965 F. Supp. 66, 71 (D.D.C. 1997); *FEC v. Nat'l Right to Work Comm., Inc.*, 916 F. Supp. 10, 15 (D.D.C. 1996) ("Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time" (quotation marks omitted)) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)). However, both parties agree that there is a split of authority on whether the FEC actually retains this power under the statute, and CREW does not cite to any binding authority definitively supporting the existence of such an exception.  *See* Def.'s Mot. Summ. J. at 47; Pl's Reply at 16. Without determining which side of the split is more persuasive, it is clear that litigation risk abounds in pursuing this theory.

Second, the statute of limitations may be tolled during periods of "continuing violations" of unlawful activity.  *See Earle v. District of Columbia*, 707 F.3d 299, 306 (D.C. Cir. 2012).  The continuing violations doctrine applies in two circumstances.  Most commonly, it applies when "a violation did not become clear until it was repeated during the limitations period, typically because it is only its cumulative impact . . . that reveals its illegality."  *Id.* (quoting *Taylor v. FDIC*, 132 F.3d 753, 765 (D.C.Cir.1997)).  The doctrine also applies in cases where "the text of

the pertinent law imposes a continuing obligation to act or refrain from acting," which is a question of statutory construction. *Id.* at 307. For example, in *CityFed Financial Corporation v. Office of Thrift Supervision*, a court in this district found a continuing violation where an entity failed to maintain the required capital amount every day. 919 F. Supp. 1, 6 (D.D.C. 1994). CREW contends that this former exception applies, because FECA imposes a "continuing obligation" to disclose the identities of donors, but does not cite to any cases applying the doctrine to FECA in such a manner, nor to the text of FECA itself. *See* Pls.' Mot. Summ. J. at 39. In fact, although FECA does requires periodic filing of information, no section cited by either party appears to impose a continuous reporting requirement. *See, e.g.*, 52 U.S.C. § 30104(a)(1) (imposing specific filing requirements for political committees' disclosures). Accordingly, pursuing a case pursuant to this theory is also fraught with risk.

Third, the statute of limitations may be tolled when a defendant fraudulently conceals its wrongdoing through deception that is separate from the wrongful act itself. *See Sprint Commc'ns Co., L.P. v. FCC*, 76 F.3d 1221, 1226 (D.C. Cir. 1996). However, the exception does not apply in cases where the plaintiff discovered or, with due diligence, should have discovered the injury that is the basis of the action. *Id.* Generally, if a party discloses information to the FEC sufficient to show the alleged injury, the FEC "should have" discovered the injury. *See FEC v. Williams*, 104 F.3d 237, 241 (9th Cir. 1996). Therefore, this theory too presents significant barriers to success.

Taken together, the FEC had a rational basis to conclude that, on its face, the applicable statute of limitations had run on the "obvious" expenditure claims and any legal arguments to the contrary faced significant litigation risk. No theory presented by CREW is close to watertight. Regardless of whether the FEC could have potentially sought equitable relief outside the statute

of limitations, the controlling commissioners were reasonable in concluding that it was not worth the litigation risk to pursue charges in this case.  This is particularly true given that injunctive remedies would be moot, given CHGO's defunct status, and pursuing financial remedies would face significant litigation risks as well.  Even putting these issues to the side, the controlling commissioners almost certainly could not have found a significant risk of future harm by CHGO as required by *Christian Coalition*, because CHGO was defunct at the time of the decision.  *See* J.A. 1519.

The FEC was also rational in finding litigation risk with the continuing violation theory. Plaintiffs could cite to no precedent suggesting that the reporting requirements are continuous and the text of FECA does not clearly establish that entities have a continuous obligation to report information.  If it did, it seems the statute of limitations would be largely irrelevant in cases of alleged non-disclosure or failure-to-register.[4]

Finally, the FEC would have had to engage in fact-intensive litigation to prove that it, with reasonable diligence, was unable to discover the basis for the alleged injuries caused by CHGO.  Given that the DCCC and CREW filed administrative complaints alleging that CHGO had engaged in the very expenditure-based actions at issue before the Court, the FEC had a rational basis for concluding that the litigation risk associated with pursuing the action was high. Accordingly, the controlling commissioners did not abuse their discretion because they had a rational basis to conclude that the litigation risk associated with pursuing a claim in light of the statute of limitations outweighed the benefit of continued prosecution.

---

[4] Of course, the Court need not resolve this legal issue to determine that the FEC had a rational basis for not proceeding.

## B.  The "Novel Legal Issues" Surrounding Political Committees

The FEC also dismissed the case against CHGO because the political-committee issue presented "novel legal issues" that the committee did not have the time or briefing to decide. J.A. 1519.  Those issues included whether vendor commissions or other general payments to officers and directors count toward express-advocacy expenditures.  CREW concedes that if the FEC excludes all vendor payments from its "political activity" total but includes it in its disbursement total, then the amount of money spent on political activity would be less than 50% of CHGO's total expenditures.  Pls.' Reply at 31.  The controlling commissioners took no stance on the matter, but concluded that the litigation risk justified non-prosecution.  *See* J.A. 1519. CREW contends that the law was so clear on the matter that the FEC abused its discretion by concluding that the issues were novel.  *See* Pls.' Mot. Summ. J. at 43–45.  In support of its argument, CREW cites to OGC's report which stated that the political-committee violation was "obvious," and in reply cites to a 2016 case from this district, *CREW v. FEC*, No. 14-cv-01419 (CRC), 2016 WL 5107018 (D.D.C. Sept. 19, 2016).  *See* Pls.' Mot. Summ. J. at 44 & n.24.

As noted above, FECA's rules governing political committees apply only to "organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate."  *Buckley*, 424 U.S. at 79.  To determine such a "major purpose," the FEC applies a case-by-case analysis, *see* Political Comm. Status, 72 Fed. Reg. 5595, 5601 (Feb. 7, 2007), but has suggested that "40% of spending does not clearly signify a major purpose," instead requiring that an organization spend at least 50% of its resources on express advocacy, *see CREW*, 2016 WL 5107018, at *12 (internal quotation marks omitted).  "A reasonable application of a 50%-plus rule" is likely not an abuse of discretion.  *See CREW*, 2016 WL 5107018, at *12.  It is unclear which expenses can rationally be categorized as express

advocacy, but the court in *CREW* recently held that excluding "*all* non-express advocacy speech" from consideration in determining an organization's major purpose was contrary to law. *Id.* at *10. However, that court did not establish a bright-line rule "declar[ing] contrary to law *any* approach taken by the FEC that does not assess political committee status by considering *all* electioneering communications." *Id.* at *11. Notably, this case was decided after the FEC's decision to dismiss, and even during the pendency of this lawsuit, CREW conceded that the scope of the "major purpose test" was the subject of litigation in other cases. *See* Pls.' Mot. Summ. J. at 44 n.24. Neither side has cited to any specific case dealing with the categorization of vendor payments or other general payouts to executives. *See* Pls.' Reply at 31–33.

The FEC had a rational basis for concluding that "novel legal issues" existed in this case, and that resolving them in this forum would have been a "pyrrhic" exercise fraught with litigation risk. CREW does not cite to any authority that definitively resolves how to treat vendor commissions, and relies on factually categorizing certain "vendor fees" as expenses related to political activity to reach its conclusion. *See* Pls.' Reply at 31–33. In fact, the only case that CREW cited was decided well after the FEC dismissed the case against CHGO. Regardless of whether the controlling commissioners were ultimately wrong in light of the 2016 case, the litigation risk existed at the time they decided to dismiss. But even if it had been decided before, the case did not draw any bright-line rules about how to calculate spending. *CREW*, 2016 WL 5107018, at *12. Nor does OGC's characterization of the violations as "obvious" make the FEC any less rational. FECA squarely allocates prosecutorial authority to the FEC; OGC is merely its investigative arm, and in this case, the controlling commissioners disagreed with OGC. *See* 52 U.S.C. § 30106(a)–(f). Although, as the FEC concedes, *see* Def.'s Reply Supp. Def.'s Mot. Summ. J. at 22, ECF No. 24, the controlling commissioners may well

have agreed with CREW's interpretation, it was rational for them to conclude that continued

prosecution was unjustified in light of the litigation risk that the "novel" issues presented.  Thus,

it was not an abuse of discretion for the controlling commissioners to conclude that dismissal

was justified, particularly in light of the numerous other problems with the case.

### C.  Logistical and Remedial Problems Associated with Prosecuting a Defunct Entity

The Court next addresses whether the FEC's reliance on the defunct nature of CHGO was

rational.  The FEC contends that the controlling commissioners rationally concluded that the

defunct nature of CHGO would make prosecution and meaningful remediation difficult.  *See*

Def.'s Mot. Summ. J. at 33–39.  CREW responds that the FEC could have sought remedies from

CHGO's founders even after dissolution.  *See* Pls.' Reply 34–40.

As noted above, the Court will only disturb the FEC's decision not to prosecute if the

challenging party shows an abuse of discretion.  *Rose*, 806 F.2d at 1091.  The agency is afforded

such discretion because the decision to pursue an allegation involves "a complicated balancing of

[] factors" including whether agency resources are better spent elsewhere and the agency's

likelihood of success.  *Chaney*, 470 U.S. at 831.  The weighing of those factors is squarely within

the agency's expertise.  *See id.* at 831–32.  "[I]t is not [the] Court's place to direct the

Commission how to expend its resources, and it is certainly not the plaintiffs'."  *Akins v. FEC*,

736 F. Supp. 2d 9, 22 (D.D.C. 2010).  In *Nader v. FEC*, the plaintiff claimed that the FEC abused

its discretion in declining to prosecute several groups that, by the FEC's own admission "may

have engaged in political activity that would have obligated them to register as political

committees."  823 F. Supp. 2d at 65.  The FEC "concluded that each [group] was either defunct

or had ceased operations, and that in those circumstances its prosecutorial discretion should be

exercised to dismiss the allegations as to those groups."[5]  *Id.*  The court found that this decision

was "not contrary to law, and represent[ed] a reasonable exercise of the agency's considerable

prosecutorial discretion."  *Id.*

The controlling commissioners, who favored finding expenditure-based violations just

months before, reasoned that enforcement had become an "academic exercise" after "it became

apparent that CHGO was a defunct organization" with no money, no officers, and no directors.[6]

J.A. 1516.  Although the FEC did not completely rule out the possibility of proceeding on these

grounds, it concluded that the "case did not warrant the further use of commission resources" and

that any victory would be "pyrrhic."  J.A. 1516.  Citing *Heckler* and past administrative cases,

the FEC determined that "the most prudent course was to close the file consistent with the

---

[5] CREW's attempt to distinguish the facts of *Nader* from those here is unconvincing. Although it is true that the *Nader* court considered "stale witness memories" and other practical difficulties that the passage of time would create for the FEC, *see* 823 F. Supp. 2d at 65, the Court separately emphasized the defunct nature of the potential prosecutorial target.  That court credited the FEC's assertion that prosecution would be "hampered" by the fact that the organization was "essentially [] defunct," despite the plaintiff's claim that the FEC was "exaggerating the difficulty of investigating these defunct organizations."  *See id.*  The Court concluded that "the FEC [was] in a better position to evaluate its own resources and the probability of investigatory difficulties than [the plaintiff]," which supported the FEC's dismissal on the basis that the organizations were "either defunct or had ceased operations."  *See id.*

[6] CREW's argument that the FEC could get around these enforcement difficulties by "simply releasing the identities of CHGO's contributors," *see* Pls.' Reply at 39, ignores the significant First Amendment challenges that this circuit has recognized in cases of FEC disclosure of its investigatory materials.  *See Am. Fed'n of Labor & Cong. of Indus. Organizations v. FEC*, 333 F.3d 168, 178–79 (D.C. Cir. 2003).  Without a finding that CHGO was a political committee, the FEC's release of such information could very well be unconstitutional.  *See id.* at 178 (finding that a policy whereby the FEC released its investigatory material gave "parties a large potential 'bonus' for filing a complaint because even if their allegations of wrongdoing are rejected, they may still obtain access to thousands of pages of their opponents' internal strategic information' and that without careful tailoring, disclosure creates "serious constitutional difficulties").  The Court need not resolve whether release in this case would violate the First Amendment.  It suffices to say that the FEC would expose itself to serious legal challenges if it were to release donor information prior to a finding that CHGO was a political committee.  A request for such names pursuant to the Freedom of Information Act may require the FEC to grapple with these "novel" issues.

Commission's exercise of discretion in similar matters." *Id.* at 1519.  It does not matter—as CREW suggests—that the FEC *could* have obtained a remedy.  Like in *Nader*, the FEC's conclusion that CHGO had become a defunct organization supports its exercise of discretion beyond the highly deferential standard the Court uses here.  It was rational for the FEC to have concluded that pursuing further proceedings, beginning with conciliation, would have been extremely difficult on the Commission, and that any resolution it could have ultimately obtained would have been worth less than the effort that it would have needed to put forward.  This is in line with common sense; the FEC has limited resources, and may have little interest in punishing a group that it knows is unlikely to violate FECA again and possibly could not defray the costs of litigation through the payment of a fine.  That cost–benefit analysis is more than enough to survive under the abuse of discretion standard.  Although Plaintiffs may have chosen a different path were they in charge of the agency, neither they nor the Court are in a position to second-guess the FEC's exercise of discretion here.  Simply put, "[w]e are not here to run the agencies." *Rose*, 806 F.2d at 1091.  Accordingly, the Court finds that the FEC was rational in its reasoning regarding the defunct nature of CHGO.

*     *     *

Taken together, the FEC acted rationally in dismissing the case against CHGO.  Its three stated considerations—the statute of limitations, the novelty of the issues surrounding whether CHGO was a political committee, and the difficulty of prosecuting and obtaining meaningful remedies from a defunct organization—inform whether the litigation risk made the case worth pursuing, and accordingly whether the FEC abused its discretion.  The FEC rationally saw the path to successful prosecution as fraught with litigation risk.  Based on the face of the statute of limitations, the "obvious" violations of FECA became time-barred before the decision, and no

exception to the statute presented a clear path forward.  Particularly at the time of dismissal,

determining whether CHGO was a political committee was not legally clear; in fact, the FEC

was in litigation over the categorization of costs in a different case at the time of dismissal.

Looming in the background of these legal uncertainties was the status of CGHO.  Even if the

FEC could have technically succeeded in its prosecution, the case had become logistically

difficult.  CHGO had no assets, no lawyer, and no apparent agent with whom the FEC could

easily conciliate.  Thus, the FEC saw its prospects for remediation as bleak relative to the overall

litigation risk present in the case.  As a result of all of these considerations, in a close vote, the

FEC decided against proceeding.  Because this decision was not an abuse of discretion and the

Court is not in a position to second-guess the rational exercise of prosecutorial discretion under

FECA, the Court must grant summary judgment for Defendant.

## VI.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is **DENIED** and

Defendant's motion for summary judgment is **GRANTED**.  An order consistent with this

Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 22, 2017                                         RUDOLPH CONTRERAS
                                                                               United States District Judge